15129

DARBY *ET AL.* v. SOUTHERN RY. CO.

(10 S. E. (2d), 465)

434

*Messrs. John M. Daniel, Attorney General* and *Irvine F. Belser,* for appellants,

*Messrs. Sidney S. Alderman, Frank G. Tompkins* and *McDonald, Macaulay & McDonald,* for respondent,

July 17, 1940.

The opinion of the Court was delivered by MR. J. STROM THURMOND, ACTING ASSOCIATE JUSTICE.

This is an appeal from an order of his Honor, Judge Arthur L. Gaston, refusing to grant an order of mandamus against the Southern Railway Company, requiring it to restore trains Nos. 117 and 118 as regular, daily passenger trains, between Rock Hill and Kingville, South Carolina, instead of the mixed passenger and freight train which had been substituted therefor, operating daily except Sundays. The facts are fully set forth in Judge Gaston's order, which will be reported herewith.

The appellants contend that under Sections 8204, 8205, 8305 and 8405 of the Code of South Carolina, 1932, and Article 9, Section 8 of the Constitution of South Carolina, the railway company has no right to discontinue separate passenger service on its line, or any portion thereof, without the permission of the Public Service Commission previously obtained. An analysis of the various acts and rules promulgated by the commission thereunder, may lead to a better understanding of the matter.

Sections 8204 and 8395 were enacted in 1882 and Section 8205 in 1885. Section 8204 provides that railroads shall be subject to the general law as set out in the chapter in which these sections are contained, new Chapter 160 of the Code of 1932. Section 8205 provides that every railroad company shall have all the rights and privileges granted in said chapter, and that "said rights, powers, privileges, liabilities, provisions and limitations shall constitute part and parcel of the charter of every such corporation." Section 8395 provides that every railroad shall provide reasonable accommodations for the convenience and safety of its passengers, and shall be penalized for any willful neglect of such duty.

Section 8405, which was enacted in 1896, requires that the railroad commission (now the Public Service Commission) examine into the schedule of all railroads of the State, "with a view to ascertain if said roads can reasonably make close connection with intersecting roads * * *. *And,*

*the better to secure connections,* they may require all persons, associations or corporations operating any railroad or railroads (except such as may be in the hands of Receivers) to run at least one unmixed daily passenger train each way, over such railroad or railroads, and may likewise require such persons, associations or corporations to furnish to the traveling public facilities for passage over such railroads twice each way daily." (Italics added.)

It is to be noted that though this section gives the commission the right to require the operation of one unmixed train daily, it is for the purpose of making connections with intersecting lines, and there is no inference in the section that the commission can arbitrarily make such a requirement for any other purpose, nor even then without granting to the corporation a hearing on the merits.

Under Section 8251 of the Code, also an Act of 1882, the commission is given general supervision of all railroads, and required to examine them to keep themselves informed as to their condition and the manner in which they are operated, with reference to the security and accommodation of the public and the compliance with the provisions of their charters and the laws of the State. No authority is given to the commission to require any particular type of service, but merely to supervise the roads and, inferentially, to require additional service, if, after a hearing, it be determined that such service is necessary for the security and accommodation of the public.

Section 8248 is a portion of Act No. 533 of 1922, found at page 956 of the Acts of that year, by which the number of commissioners was increased to seven, and their powers increased from supervision of all railroads and railways, express and telegraph companies, as set out in Section 8251, to authority "over all transporting and transmitting corporations, and public utilities." Thus it will be seen that in the Act of 1922, the Legislature very clearly made a distinction between "public utilities" and "transport-

ing and transmitting corporations," over which alone the Railroad Commission had formerly had authority. Therefore Section 8248 of the Code, which is Section 6 of the Act of 1922, in setting out that the Railroad Commission is vested with power to "regulate the rates and service of every public utility in this State and to fix such just and reasonable standards, classifications, regulations, practices and measurements of service to be furnished, imposed or observed and followed by every public utility in this State" must refer to those companies which are classified as "Public Utilities" in contradistinction to "transporting and transmitting corporations."

In further support of this construction of the statute, it will be noted that in the same year, 1922, Section 8252 of our 1932 Code was passed as a part of Act No. 525, found at page 938 of the Acts of that year. By Section 8252 the term "public utility" is defined to mean, "every corporation and person furnishing or supplying in any manner gas, electricity, heat, electric power, water and street railway service, or any of them, to the public, or any portion thereof, for compensation."

These statutes must be construed together. As was said in the case of *City of Columbia v. Pearman et al.*, 180 S. C., 296, at page 309, 185 S. E., 747, 752: *"Columbia Gaslight Company v. Mobley, supra* (139 S. C., 107, 137 S. E., 211), however, appears to be more directly in point. The court there did consider what is now section 8248 (section 6 of act approved March 6, 1922, 32 St. at Large, p. 956), and held that, as this section did not define what are 'public utilities' within the meaning of this term as used in the Statute, and as the Statute was elsewhere silent as to what corporations this classification included, it was necessary, in order to correctly interpret the legislative intention, to construe this act in connection with the act approved March 24, 1922—with especial reference to what is now section 8252 of the Code."

Therefore, Rule No. 5 of the commission, which it ■ represents as having been promulgated under authority of Section 8248, in requiring that "No rate, toll, charge, fare nor service of any public utilitity under the regulation of this Commission" shall be deemed approved or consented to by the Commission until such rate, toll, etc., has been affirmatively approved, refers only to "public utilities" as defined in Section 8252, and does not refer to railways.

Rule No. 12 of the commission was passed under ■ authority of Section 8418 of the Code, which requires that notice of any change in passenger schedules or time tables be published at least three days before the change goes into effect. By Rule 12, the railroad is required to publish notice of such proposed change eight days before it is made, and to give the commission notice in writing for an equal period of time. There is nothing in the rule, nor in the statute under authority of which it was passed, which requires a railway company to do more than give this notice, as neither the statute nor the rule itself mentions the necessity of permission from the commission. If such a procedure as is contended for by the commission is indeed necessary for the protection of the public, it is a matter for legislative rather than judicial action.

The commission, appellant herein, relies largely on ■ the recent case of *Southern Railway Company v. South Carolina Public Service Commission,* recently decided by a three-Judge Federal Court sitting in the Eastern District of South Carolina, which decision is reported in 31 F. Supp., pages 707, 714. In that case Judge Parker, in writing the opinion of the Court, said: "The duty of railroad companies to furnish passenger service, as we have seen, is unquestionably imposed by the law of the State; *but the general law does not prescribe what service shall be a sufficient discharge of the duty.* Section 8405 vests discretion as to this in the Commission, authorizing it to require

the running of passenger trains, as distinguished from mixed trains, and to require one such train a day each way instead of the less frequent service that might be offered in discharge of the duty. * * * *It must be remembered that the issue before the Commission was not whether the plaintiff should be required to furnish more or less passenger service* over the portion of the line in question, *but whether it should be permitted to abandon all passenger service over it."* (Italics added.)

It is, therefore, clearly seen that the case in question, while holding that the company was required to operate passenger trains, did not by any means hold that any particular type of service was required, but that it was within the discretion of the commission to specify what type of service was necessary. In doing this, we think it quite clear that the commission, before specifying any particular type of service, and before exercising its discretion in this matter, was bound to have a hearing on the merits of the case.

Adequate service to the public is a primary consideration and duty of the railroad companies. They operate under a franchise granted to them by the State, and are bound to serve the public fairly and impartially. But, where the public does not use the facilities furnished to a sufficient extent to compensate the company therefor, it is a matter for the commission to determine, after a hearing, whether or not more than the minimum of service should be supplied, their action being subject, of course, to the judicial review. In this connection we quote with approval from the case of *Blease v. Charleston & W. C. Railway,* 146 S. C., 496, 144 S. E., 233, 240, as follows: "A railroad corporation has only restrictive power in the management of its business, affairs, and property, for the Congress of the United States and the general assembly of the state enact laws on the subject; the Interstate Commerce Commission and the State Railroad Commission promulgate rules and regulations for its control; then its employees have their

say in the premises; however, the writer has no criticism to make of this situation, but does think that such corporation should be guarded against undue encroachments *without full investigation,* and a clear case established showing that the same are *necessary for reasonable public service,* without confiscating the railroad's property." (Italics added.)

Counsel for appellants have cited two cases, *Missouri Pacific R. R. Co. v. Kansas,* 216 U. S., 262, 30 S. Ct., 330, 54 L. Ed., 472, and *People ex rel. Cantrell v. St. Louis, A. & T. H. R. Co.,* 176 Ill., 512, 52 N. E., 292, 35 L. R. A., 656, as holding authoritatively that mixed service is not adequate passenger service. In both of those cases, this conclusion was reached from the particular facts of the respective cases, after a hearing and investigation. But even if the Courts in question meant at that time to lay down an arbitrary rule to be followed, which we think they did not, it must be borne in mind that the most recent of the cases was decided more than thirty years ago, when the railroad companies had a practical monopoly of the transportation of passengers for all except very short distances. That condition no longer exists, as the railroad lines are now, in many instances, paralleled by bus lines, and the private automobile, traveling on State maintained roads, has deprived the railroads of a large part of their passenger business. Hence, a standard setting up what constitutes "reasonable accommodations" thirty years ago could not possible be a reasonable and just standard to be followed arbitrarily today. If the public has other facilities for travel furnished either by private automobiles or by bus lines, so that they no longer patronize the railroads, then it is a matter to be determined by the commission only after a full hearing and investigation of the facts, whether or not a mixed train furnishes the "reasonable accommodations" required by the statute. *The public must be served* by the railroads, but

should not expect service to any greater extent than they are willing to use the service provided for them.

The order of his Honor, Arthur L. Gaston, is hereby affirmed and approved in its entirety, and the complaint herein dismissed.

MR. CHIEF JUSTICE BONHAM and MR. JUSTICE BAKER concur.

MESSRS. JUSTICES FISHBURNE and STUKES discent.

MR. JUSTICE STUKES (dissenting) :

I regret that I am unable to agree with the conclusions and result of the opinion of Mr. Acting Associate Justice Thurmond and feel that I should, at least in part, state my reasons. The result of it will, it seems to me, practically deny to the State, unless and until new legislation be enacted, power to effectively regulate in the public interest, through the Public Service Commission, the intrastate service of the railroads, although the power and machinery of regulation reasonably protective of the public have long been thought to exist. See Chapter 160 of the Civil Code of 1932, some of the provisions of which were enacted as far back as the year 1882. The Constitution of 1895, Article 9, Section 14, continued the pre-existing commission for the purpose and as the agency of such regulation. See also the clear and well-reasoned opinion by Mr. Justice Woods in *Railroad Commissioners v. Columbia, N. & L. R. R. Co.,* 82 S. C., 418, 64 S. E., 240.

It is universally held in the other jurisdiction of this country that such power exists and nowhere have I found authority for the position taken by the respondent and sustained by the judgment below, to the effect that there must be an express statute or commission rule authorizing each detail of regulation.

"Under its power to regulate the operation of railroads, the State may regulate matters relating to train service and accommodations. Thus the State may designate the location of stations, the trains that shall stop thereat, and the length

of the stop; facilities and accommodations on trains; *and may require passenger service between points within the state, and separate trains for passengers and freight.*" 51 C. J., 1012. (Italics added.)

"The matter of the regulation of common carriers is primarily a legislative function, but experience has demonstrated the inability of the various legislative assemblies to cope with the problem; hence the power is generally delegated to a commission created for that purpose. Particularly with respect to railroads, the need for strict and intimate governmental control for public protection very early became manifest." 9 A. J., 460.

The power and propriety of the regulation in the public interest of railroads and other public utilities is grounded upon the public nature of the service and the public use to which property is dedicated. 51 C. J., 9.

However, granting respondent's position that a statute or commission rule, whereby the "regulation" here sought to be enforced is expressly provided for, must be pointed out, it seems to me that Rule No. 5 (b) of the commission, to the applicable effect that no service of any utility under its regulation shall be deemed approved or consented to unless such approval and consent be actually and affirmatively made, applies to railroads generally and to the respondent in this case. How else can it be construed?

In answer to the foregoing queston it is contended by respondent that Section 8248 of the Code of 1932 is not applicable to railroad corporations despite the inclusion therein of the words "every public utility," and that the present Public Service Commission does not perforce this section have jurisdiction to supervise and regulate the service of the railroads of this State, on which account Rule No. 5 of the commission, predicated upon this Code section, is not applicable to railroad companies. In substantiation of this position recourse is had to the origin of the statute, which will be briefly examined.

Approved on March 6, 1922, was Act No. 533 of the General Assembly of that year, the purposes of which, according to its title, were to create a new "Railroad Commission" in which were consolidated the former Railroad Commission and Public Service Commission, to define the new commission's powers and duties, and "to Safeguard the Interests of the People of the State in Relation to all Transporting and Transmitting Corporations and Public Utilities Operating in This State."

In Section 5 of this Act, XXXII Statutes 956, it is provided that all the powers and duties then devolved by law upon the Railroad Commission and the Public Service Commission, as then constituted, shall be exercised by the Railroad Commission thereby established, which former agencies as they then existed were consolidated into the newly created Railroad Commission. Immediately following that provision of the Act and constituting Section 6 thereof was the matter now codified as Section 8248 of the Code. The seven sections of this Act No. 533, approved March 6, 1922, exclusive of the repealing clause, constitute Sections 8243 to 8249, both inclusive, of the Code of 1932.

It will be noted that there occurs in such Act no definition of the term "public utility," but in Section 1 of the Act jurisdiction is vested in the commission "over all transporting and transmitting corporations, and public utilities"; and Section 6 (Code 8248 was included in the Act, whereby express jurisdiction was given the commission to supervise and regulate the rates and service of every public utility. Unless it should be held that a railroad does not come within this broad and inclusive term it cannot be successfully contended that the Railroad Commission, by subsequent change in name the Public Service Commission, does not have jurisdiction to supervise and regulate the service of railroads subject to its jurisdiction, which it had already at the time of the passage of this Act been attempting without question to do for many years.

Concede, as has been held, that a statutory enactment is necessary to bring any particular class of utilities not theretofore "regulated" by the commission within its regulation, such rule cannot be applied to exclude railroads from the provisions of the Act under discussion for they had long been within the jurisdiction of the Railroad Commission and furthermore jurisdiction over them as "transporting corporations" was re-enacted by the express terms of this statute, Section 1, *supra*. The later Act of the same session of the General Assembly, which will be now adverted to, whether necessary for the purpose or not, expressly brought within the jurisdiction of the commission by name and definition certain public utilities other than, and therefore in addition to, railroads.

Appearing earlier in the published Acts of 1922, but approved subsequently (March 24, 1922) to the above Act No. 533, was Act No. 525, XXXII Statutes 938, which was enacted, according to its title, to enlarge the powers and duties of the Public Service Commission, determine its jurisdiction and procedure, and devolve said powers, duties and jurisdiction on the Railroad Commission of South Carolina. It consisted of the present (1932) Code, Sections 8252, 8253, 8254, 8255 and 8262, the last-mentioned section having subsequently been amended. It was recited in the Act (Section 2) that it devolved duties additional to those theretofore imposed by law upon the Railroad Commission.

In Code, Section 8252, originally part of Act No. 525 of 1922, occurs a definition of "public utility," which definition was, however, expressly limited to the use of the term in that Act; hence it does not seem that the failure to include railroad corporations in this definition can be properly advanced as an argument that the latter do not come within the present Section 8248 of the Code for that section was not a part of Act No. 525. Also of importance in this connection is the fact that in the following section of Act No. 525, now 1932 Code, Section 8253, applicable to public

utilities other than railroad companies, are repeated the exact powers of the commission with respect to them that were therefore included in the prior Act No. 533, Code, Section 8248. Thus the result of respondent's argument upon the point is that the General Assembly did a vain and futile thing in including such grant of powers in Act No. 525 as it had already granted such powers to the commission by its former Act No. 533, for its argument is that the provisions of Act 533, which now constitute Code, Section 8248, apply only to utilities other than railroad companies, and that there are two sections of the Code, 8248 and 8253, granting the same powers to the commission of supervision and regulation of the service of public utilities other than railroad companies and none granting similar powers over the latter. This seems to be an unreasonable and illogical result not comporting with legislative intent, and a construction of these sections together for the purpose of ascertaining the intent and the giving of meaning and effect to both of them, in accord with the established rule of statutory construction, result in the finding that Code, Section 8248, is applicable to railroad companies insofar as the supervision and regulation of them is within the jurisdiction of the State.

But there is no real need of search for and determination of the legislative intent here for at least three further considerations make the foregoing construction necessary. First is the provision of Section 8204 and the last provisions of Sections 8205 and 8251 of the 1932 Code, which are to the effect that the provisions of that chapter of the Code, which is number 160, are expressly made in mandatory language applicable to all railroads and railways and the owners and operators of them. Since Section 8248, that which is contended by respondent to be inapplicable to railroads, is a portion of the same chapter of the Code which includes Sections 8204, 8205 and 8251, in fact is sand-

wiched between 8204, 8205 and 8251, it is expressly applicable to railroads under the plain terms of the Code.

The second compelling consideration referred to is the fact that in order to exclude railroads from the application of Section 8248, by which the power and jurisdiction of supervision and regulation of the service, etc., are vested in the commission, it would be necessary to so construe the expression "every public utility" as not to include railroads within its meaning, which construction would certainly do violence to the long and well-established judicial definition of the term. 51 C. J., 411; *ibid.,* page 5: " * * * Whether or not a given business, industry, or service is a public utility does not depend upon legislative definition, but upon the nature of the business or service rendered  *  *  * and the question whether or not a particular company or service is a public utility is a judicial one and must be determined as such by a Court of competent jurisdiction."

The third consideration, conclusive without the others which nevertheless well fortify it, is the fact that this Court has recently construed Code Section 8248 against respondent's contention and as not being restricted in its application by the definition of the term "public utility" contained in and for the purposes of Section 8252. In *City of Columbia v. Tatum,* 174 S. C., 366, 177 S. E., 541, 553, power of the commission to order the substitution of motor buses for street cars, despite the limitation of its jurisdiction by the definition in Section 8252 to street railway service, was sustained. And this Court in adopting as its decision the Circuit decree and in further justification of it said, speaking through Mr. Justice Bonham, now Chief Justice:

"It may not be amiss to add that the jurisdiction of the railroad commission in the premises is further sustained by the provisions of Section 8248  *  *  *  (quoting the section).

"It would be difficult to conceive of a more liberal grant of power. It is sufficient to embrace that power which the

railroad commission exercised in these premises, which is approved by the circuit decree."

In the later case of *City of Columbia v. Pearman,* 180 S. C., 296, 185 S. E., 747, 753, where the commission took the legal position that should it permit the complete substitution of buses for street cars it would thereafter lose jurisdiction to regulate the service because of the definition of public utility in Section 8252, this Court held to the contrary and said that it was held in the *Tatum case, supra,* that the commission's power to allow the partial substitution of motor buses was derived from Section 8248, which section was thereupon held to likewise empower the commission to authorize complete substitution and further that the commission would "have full power and jurisdiction, under the provisions of that section (8248), to supervise and regulate public transportation in the City of Columbia supplied wholly by means of motor busses."

It was contended in the latter case that the decisions in *Shealy v. Taylor,* 128 S. C., 365, 122 S. E., 491, and *Columbia Gas & Light Co. v. Mobley,* 139 S. C., 107, 137 S. E., 211, were controlling to the effect that Section 8248 was limited in its application to public utilities as defined in Section 8252; but that position was overruled and in significant language this Court had the following to say thereabout: "Should this holding appear to run counter to any former decision of this Court, then such decision is overruled to that extent."

The following pertinent quotations are from the Circuit decree which was approved and ordered to be reported by this Court as a part of its decision:

"This Act (No. 533 of 1922) was a statute complete within itself, and nothing incident to its adoption suggests that the simple language of Section 6 (Now Section 8248 of the Code) was intended to have any less than its obvious meaning and effect. The legislative intention must be gathered from a literal interpretation of the language of the

statute where it is plain and unambiguous. *State Company v. Jones,* 99 S. C., 218, 82 S. E., 1048."

"The Legislature could not have more clearly indicated its intention that this second statute (No. 525 of 1922) should not limit the broad powers conferred on the commission by Section 6 of the first Act of 1922 (now Section 8248 of the Code) than it did in Section 2 of the second statute, which codified as Section 8255, says: 'The duties hereby (By Sections 8252-8255) devolved upon said commission are in addition to those now imposed by law upon said railroad commission.' This can only mean that the Act of March 24, 1922, adds to and does not subtract from the Act of March 6, 1922. *State Company v. Jones, supra.*"

It would seem clear that the foregoing declarations and that of the present Chief Justice in delivering the opinion of this Court in the *Tatum case, supra,* are conclusive and controlling that the plenary powers vested in the Public Service Commission by Section 8248 of the Code of 1932 "to supervise and regulate the rates and service of every public utility in this State", etc., is inclusive of all utilities insofar as they are otherwise within its jurisdiction; and this without the necessity of the available reliance in this case upon the plain statutory provisions in Sections 8204, 8205, and 8251, pointed out above, that the provisions of that chapter of the Code, in which is included Section 8248, shall apply to all railroads.

It follows that Rule 5 of the Commission (by its terms expressly applicable to "any public utility under the regulation of this Commission") is applicable to the respondent here and the record shows has been violated by it, hence the several exceptions thereabout should be sustained.

Independent of Code, Section 8248, and Rule 5 of the commission support is found for the conclusion I reach in the brief of respondent. There it is argued that under Code, Section 8405, the commission has the right to require the operation of one unmixed train daily for the purpose of

making connections with intersecting lines, but that it cannot do so without granting the railroad a hearing on the merits; then the converse should in reason be true and the railroad should not undertake to discontinue such an established service without or before the corresponding hearing before the commission. Similarly, with respect to the position of the appellants that a mixed train does not afford reasonable accommodations for passengers, referring to Code, Section 8395, respondent argues that such is a question of fact to be decided by the commission after a hearing of the evidence, which is exactly the course which the commission seeks to require the respondent to follow; instead respondent has seen fit to defy the commission and its powers except to the extent indicated by this argument that it may hold a hearing in the nature of a post-mortem examination.

Respondent in reference to Code, Section 8251, an Act of 1882, admits that that section empowers the commission to supervise the railroads and inferentially gives it power to require additional service if after a hearing it be determined that such service is necessary in the security and accommodation of the public, but, inconsistently it seems to me, refuses to admit that the corresponding power exists and that the discontinuance or diminution of existing service may be made by the company without application to and a hearing thereon by the commission.

Respondent seeks to justify its disregard of the commission by the delay with which the commission has heretofore handled applications of the respondent for authority to discontinue other passenger train operations and to discontinue agency stations, but such would not warrant respondent in taking any other than the legally required course in this instance. Its remedy for delays in other cases does not lie in the taking of the law into its own hands in this case. As heretofore adverted to, respondent is a pub-

lic service corporation, a public utility, and must bear the burdens of such as well as enjoy the benefits.

Upon the record the only question with which this Court is now concerned is whether the respondent railroad violated the law or a rule or rules of the Public Service Commission when it discontinued the daily passenger train and substituted therefor a daily, except Sunday, mixed train, without a permissory order therefor of the commission or a Court reversal of a contrary order of the commission; and the commission seeks in this proceeding to compel the restoration of the daily passenger train, not upon the merits of the controversy, but in order to restore the prior service and require the company to operate such pending the action of the commission after a hearing, and the disposition of any appeal therefrom to the Court.

But we are concerned with the merits to the extent that they should influence the discretion of the Court in the granting or refusal of the remedy sought, mandamus. Respondent therefore properly inserted in its return to the rule allegations with respect to the sufficiency of the substituted service in view of the paucity of passenger travel and the alleged great loss resulting to respondent from the former service. The latter is impressive that mandamus would be a severe remedy *pendente lite,* if not found proper on the merits, and in view of such and in view of the fact that respondent is now furnishing the public with some passenger service I think it would be proper to reverse the judgment of the lower Court, but decline at this time to disturb the able trial Judge's exercise of his discretion in refusing the order of mandamus as sought by petitioners.

However, I do not think that the factual showing of the respondent indicates the existence of an emergency which should justify the respondent in ignoring the usual and required procedure of petitioning the commission for leave before making so material a change in its service to the public. The fact that this small part of the respondent's

service shows a loss in operation does not of itself justify its discontinuance. 51 C. J., 1016, 1017; *State ex rel. Daniel v. Broad River Power Company*, 157 S. C., 1, 153 S. E., 537, and the numerous authorities therein cited. It would seem to be the course of duty and prudence of the respondent to make its application to the commission for relief in such cases before they reach the stage of emergency.

For the foregoing reasons I think that the judgment of the lower Court should be reversed with costs to the petitioners, and the case remanded with instructions that respondent be required by order of the Court to prosecute its application for the change of service before the Public Service Commission and that the appellants may after action thereon by the commission move in this proceeding upon proper notice for a writ of mandamus, if they be so advised, and for that and other purposes consistent with the views herein expressed, this proceeding remain open. This solution is suggested by the disposition of a similar problem in *St. Louis, etc., Ry. Co. v. Alabama Pub. Service Commission*, 279 U. S., 560, 49 S. Ct., 383, 384, 73 L. Ed. 843, in which that high Court concluded as follows: "It may be that, upon full presentation of the facts, the commission would find that to continue the service would subject the carrier to an unreasonable burden; or the carrier may suggest some satisfactory substitute for the specific service now demanded of it. The commission should give to the railway the opportunity of presenting the fact; and, if an application is made promptly, the matter should be determined by the commission without subjecting the railway to any prejudice because of its failure to ask leave before discontinuing the service. * * * If after such hearing the commission insists that the service objected to be restored, further proceedings appropriate to the situation may be had in the cause in the District Court."

MR. JUSTICE FISHBURNE concurs.

## On Petition for Rehearing

Denied August 23, 1940.

*Per curiam.*

The petition for rehearing herein has been given due and careful consideration, and it appears to the Court that all the questions raised on appeal have been considered and passed upon in our decision herein.

Counsel for appellants, in the petition, attempts to raise at this time a constitutional question, alleging that the powers and duties of the commission as prescribed by Article 9, Section 12 (evidently meaning Article 9, Section 14) of the State Constitution of 1895, are involved herein. Reference to said article and section shows clearly that the appeal does in no way involve the powers and duties granted therein, which merely sets out that the commission is established, "whose powers over all transporting and transmitting corporations, * * * shall be regulated by law." Inasmuch as this question is raised for the first time by the petition for rehearing, this Court is without authority to consider the same at this time (*Graniteville Mfg. Co. v. Renew,* 113 S. C., 171, 102 S. E., 18) but even if we should so consider it, we deem that there is no merit in it.

Counsel for appellants has seen fit to ask the Court to call the Court *en banc,* under the provisions of Article 5, Section 12, of the State Constitution of 1895, claiming that the question involved herein is one of great public importance, involving the safety and welfare of the entire people of the State. In this connection we call attention to what was said with reference to the petition for rehearing in the case of *Duncan v. Record Publishing Company,* 145 S. C., 196, at page 317 *et seq.,* 143 S. E., 31, 70, where the Court said: "There is no provision, constitutional or statutory, in our law for an appeal from the Supreme Court to the Court *en banc.* Unless such right has been ex-

pressly given proper authority, no litigant has the privilege of claiming it; nor can it be granted when requested."

And also, at page 318 of 145 S. C., at page 71 of 143 S. E., where the Court said:

"As remarked before, and as indicated by both Mr. Justice Cothran and Mr. Circuit Judge Townsend, the Court, *en banc* is not an independent court, but, called as a consultative court, it becomes for the time being the Supreme Court, and, in our opinion, the call for such court should be made while the Supreme Court has pending before it, *and before it has determined,* the cause in which the assistance of the circuit judges is desired. It must be apparent that, if this court is to have the full benefit of the assistance of the learned and honored circuit judges of the state, when it shall be deemed necessary, the call for their aid should be made before the cause in which their learning and wisdom is wished has been decided by this court, so that the circuit judges may aid the justices in reaching a correct conclusion. To hold the court *en banc* after the Supreme Court has rendered its decision is but to ask the circuit judges to review the action of this court in the cause decided, not to assist its Justices in rendering proper judgment, as contemplated by the Constitution.

"As indicated above, not only the power but the privilege, of calling to the aid of the court the circuit judges, is a matter entirely for the court and its Justices; it is not a right given to a litigant. The court, and the Justices thereof, will therefore, when it is deemed advisable, without petition or suggestion from a party to a cause pending before it, call the court *en banc.*"

Also, it has been called to the attention of the Court that, after this case was argued on May 13, 1940, an Act was passed by the General Assembly of this State, which became law on approval by the Governor on May 28, 1940, wherein is provided that it shall be unlawful for any person or corporation operating a railroad service in this State to

discontinue the operation of any passenger train, or substitute mixed service for regular passenger service, as was done in this instance, without first making application to, and securing the approval of, the South Carolina Public Service Commission. Therefore, except for its application to the particular case here involved, the question of whether or not a railroad company in this State has the right to substitute mixed service for regular passenger service has become academic, and can hardly arise again in this State.

The petition for rehearing is refused.

MR. CHIEF JUSTICE BONHAM, MR. JUSTICE BAKER and MR. ACTING ASSOCIATE JUSTICE J. STROM THURMOND concur.

MESSRS. JUSTICES FISHBURNE and STUKES (dissenting):

At the time of the preparation and filing of the majority and minority opinions herein, the members of the Court were not informed of the Act of the General Assembly approved May 28, 1940, referred to in the order of the majority of the Court on the petition for rehearing.

However, upon consideration thereof we do not think that it and its enactment should affect the conclusion reached by us in our dissent from the opinion of the majority of the Court; hence it is our view that a rehearing of the case should be granted.