## ATLANTIC COAST LINE R. CO. v. PUBLIC SERVICE COMMISSION OF SOUTH CAROLINA et al.

Civ. No. 1879.

District Court, E. D. South Carolina, Columbia Division.

May 10, 1948.

Thomas W. Davis, of Wilmington, N. C., M. G. McDonald, of Greenwood, S. C., Douglas McKay, of Columbia, S. C., Edgar A. Brown, of Barnwell, S. C., and Woods & Woods, of Marion, S. C., for plaintiff.

John M. Daniel, Atty. Gen., State of South Carolina, and Irvine F. Belser, of Columbia, S. C., for defendants.

Before SOPER, Circuit Judge, and WYCHE and TIMMERMAN, District Judges.

WYCHE, District Judge.

This is an action brought by Atlantic Coast Line Railroad 'Company, a Virginia Corporation, against the Members of The Public Service Commission of South Carolina and the Governor and the Attorney General of South Carolina to enjoin them from enforcing an order of the Commission requiring the continued operation of two passenger trains between Columbia, South Carolina, and Sumter, South Carolina. An interlocutory injunction was sought, and a court of three judges was constituted pursuant to Section 266 of the Judicial Code, 28 U.S.C.A. § 380. A hearing was held at Columbia, South Carolina, on March 31, 1948, at the conclusion of which it was agreed by counsel for both sides that the case be submitted for final decree.

The basis of jurisdiction of this court is that the plaintiff is suffering large and continuous losses on account of the operation of the trains in question; that should it discontinue such operation it would be faced with numerous and onerous penalties as provided by various statutes of the State of South Carolina; that its administrative remedies have been exhausted; and that the controversy having reached the judicial stage, the protection of this court is needed on the ground that the order of the Commission is confiscatory of its property and constitutes an undue burden upon interstate commerce, in violation of the provisions of the United States Constitution.

Plaintiff operates a branch line, forty-two miles in length, between the cities of Columbia, South Carolina, and Sumter, South Carolina. Over this line it operates, in addition to a number of freight trains,

four passenger trains daily, two each way between the said points. On May 26, 1947, pursuant to Section 8250, Code of Laws of South Carolina 1942, plaintiff filed an application with the Commission to discontinue the operation of two of such passenger trains, numbers 59 and 64. Section 8250, supra, provides, in effect, that it shall be unlawful for any railroad company operating a rail line in South Carolina to discontinue the operation of any passenger train without first making application to and securing approval of the Commission. Pursuant to notice, the matter came on for hearing before the Commission on August 7, 1947, and on November 26, 1947, the Commission issued its order denying such application.

█ Defendants set up certain defenses in this court which should be considered and disposed of before discussing the merits of the controversy. The first is that this court has no jurisdiction because this action is, in effect, one against the State, presumably, though not so stated, on the ground that it violates the Eleventh Amendment to the United States Constitution, which forbids a suit against a State by a citizen of another State. Similar objections have been raised many times and held to be without merit. Reagan v. Farmers' Loan & Trust Co., 154 U.S. 362, 14 S.Ct. 1047, 38 L.Ed. 1014; Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819; Prout v. Starr, et al., 188 U.S. 537, 23 S.Ct. 398, 47 L.Ed. 584; McNeill v. Southern Ry. Co., 202 U.S. 543, 26 S.Ct. 722, 50 L.Ed. 1142; Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, 13 L.R.A.,N.S., 932, 14 Ann.Cas. 764; Western Union Telegraph Co. v. Andrews et al., 216 U.S. 165, 30 S.Ct. 286, 54 L.Ed. 430; Herndon v. Chicago, R. I. & Pac. Ry. Co., 218 U.S. 135, 30 S.Ct. 633, 54 L.Ed. 970; Harrison v. St. Louis & S. F. R. Co., 232 U.S. 318, 34 S.Ct. 333, 58 L.Ed. 621, L.R.A. 1915F, 1187; Looney v. Crane Co., 245 U.S. 178, 38 S.Ct. 85, 62 L.Ed. 230; Public Service Company v. Corboy, 250 U.S. 153, 39 S.Ct. 440, 63 L.Ed. 905.

█ A second objection is that plaintiff has failed to exhaust its administrative remedy in that it did not apply to the Commission for a rehearing. Admittedly there is no statutory provision in South Carolina requiring a railroad company to apply to the Commission for a rehearing as a condition of seeking judicial relief, as is the case with certain other public utilities. See Section 8555-6, Code of Laws of South Carolina 1942. Reliance is based upon a Commission regulation permitting such application, but even if this regulation relates to railroads, which is doubtful, it is far from being mandatory. It is well settled that in the absence of a statutory requirement making such application a condition precedent to the right of judicial review no such application need be made. Prendergast v. New York Telephone Co., 262 U.S. 43, 43 S.Ct. 466, 67 L.Ed. 853; Banton v. Belt Line Corp., 268 U.S. 413, 45 S.Ct. 534, 69 L.Ed. 1020.

Defendants rely strongly upon the case of Natural Gas Pipeline Co. v. Slattery, 302 U.S. 300, 58 S.Ct. 199, 82 L.Ed. 276. In this case there was a proceeding before the Illinois Commerce Commission to fix rates charged for gas sold in Illinois by the Chicago District Pipeline Company. The Commission issued an order requiring Natural Gas Pipeline Company to make available for examination by the Commission its books and records relating to transactions between it and the District Company. It further ordered the Natural Gas Company to submit a report showing other data in relation to its business, including the cost of its property and a statement of income and expenses in connection with supplying gas to the District Company. This order was issued pursuant to authority contained in the Illinois Public Utilities Act, which also provided that any party affected by such an order was authorized to make application to the Commission for a hearing to ascertain whether the order was improper, unreasonable or contrary to law, and that the Commission was authorized upon proper notice and hearing to rescind, alter or amend any order or decision made by it.

The Natural Gas Pipeline Company was not a party to the proceedings before the Commission. Hence, of course, the Commission could make no order affecting its own rates or its contract with the District

Company, and the court so held. Without applying to the Commission to be relieved in any respect from any requirement of the order the Natural Gas Pipeline Company went into the Federal Court and asked for an injunction against the enforcement of the Commission's order. The District Court denied the application for an interlocutory injunction, and the Supreme Court affirmed the action of the District Court on the ground that the plaintiff had not exhausted its administrative remedies before the Commission. This case is readily distinguished from the case with which we are concerned.

The Legislature of Illinois in effect had provided that the Natural Gas Pipeline Company and others in like situation were required to obey such orders, unless upon application to the Commission they were relieved of the necessity of so doing. The Pipeline Company made no application to the Commission whatever but went straight to the Court.

In this case by Section 8250, Code of Laws of South Carolina 1942, the plaintiff is required to continue to run trains 59 and 64, unless upon application to the Commission it is authorized to discontinue the trains. In this case the plaintiff applied to the Commission to be relieved of the requirements of Section 8250, and exhausted the remedy provided by the statute before going into Court, but in the Natural Gas Pipeline case the plaintiff went into Court without making any application to the Commission for relief.

Somewhat akin to the defense that the plaintiff railroad has not exhausted its administrative remedies, is the contention of the defendants that the present suit should be dismissed and that the railroad should be required to make a new application to the Commission and to present to it evidence of the earnings of the railroad system as a whole. It is suggested that evidence on this point was not offered at the hearing before the Commission, and that until it is taken into consideration by the Commission in reaching its conclusion, the administrative process is not complete. It is true that at the hearing before the Commission the railroad confined itself to evidence relating to the branch line upon which it desired to abandon the two trains, and its witnesses were not prepared on cross examination to testify as to the earnings of the system as a whole. The matter, however, was broached and the Commission was reminded that the reports of the Railroad Company on file with it contained full information on the subject and the Railroad Company offered to furnish the information if the Commission desired it. Furthermore, the Chairman of the Commission in a colloquy with one of the counsel for the protestants expressed the willingness of the Commission to take judicial notice of the reports if it was so desired. The reports showing the system's earnings were therefore available to the Commission.

These reports are required to be filed by all railroad companies operating in South Carolina by Section 8292-20, Code of Laws of South Carolina 1942. In addition, Rule 18 of the Commission, See Volume IV, Code of Laws of South Carolina 1942, p. 778 provides "Each company shall file in the office of the Commission, on or before the last day of each month, a report, duly sworn to, *showing fully and in detail* the earnings and expenses of such company during the month preceding." (Emphasis added)

The Commission had the benefit of the assistance and advice of Mr. C. E. Logwood, Director of the Rate Bureau of the Commission, who attended the hearing before the Commission and sat with the Commission in its deliberations upon the matter. With the assistance of Mr. Logwood, the Commission has filed an answer to the complaint in the pending suit to which are attached exhibits prepared by Mr. Logwood from the railroad's reports with the Commission, in which the earnings of the entire railroad system are disclosed in support of the Commission's defense that notwithstanding the railroad's losses on the branch line, its earnings on its entire system produced a substantial net annual income. Under these circumstances we do not think that the present suit should be dismissed or that anything would be gained by a new application to the Commission. It is obvious that the Commission was in possession of full information in regard to

the system's earnings, and that its ruling would not be different if a new application was made and the evidence was formally presented.

■ The Commission's exhibits were prepared in reply to certain exhibits attached to the bill of complaint which were offered by the railroad to show its earnings in South Carolina and upon its system as a whole. All of the exhibits on both sides were received in evidence by the court and were accompanied by explanations offered on the one side by Mr. Lewis F. Ormond, Assistant Vice President and Accountant of the Railroad Company, and by Mr. Logwood on behalf of the Commission. The Commission objected to the admission of this evidence on the ground that the court may not receive or consider any evidence other than that produced before the Commission. We are of the opinion that this contention cannot be sustained.

■ It must be borne in mind that this is not an appeal from an administrative order, in which a factual finding based on substantial evidence would be conclusive, nor is it a review in the nature of certiorari in which the record is sent up to the reviewing body. This is an independent action in equity brought by virtue of an act of Congress to safeguard a right guaranteed by the Constitution of the United States. In such circumstances it would appear well settled that the complaining party is entitled to a trial de novo, and that the court is required to exercise its own independent judgment as to both law and fact upon the evidence presented to and upon the record made before it. The evidence before the Commission is, of course, relevant and competent, but is not necessary. Prendergast v. New York Telephone Co., 262 U.S. 43, 43 S.Ct. 466, 67 L.Ed. 853.

A very good statement of the rule will be found in 42 Am.Jur. 660-661, as follows: "Where fundamental constitutional or jurisdictional facts are involved, the existence of which may be determined by the independent judgment of a reviewing court, a question arises as to the record upon which the determination is to be made, whether upon the record before the ad-ministrative agency and the evidence which it has taken, or upon the court's own record and the facts elicited before it. In some of the cases the question has been left open. In other cases it has been said that the essential independence of the exercise of the judicial power of the United States in the enforcement of constitutional rights requires that a Federal court determine such an issue upon its own record and the facts elicited before it, and that the right to a judicial determination of such a question includes the right to introduce evidence and have judicial findings based upon it, although such evidence was not presented to the administrative tribunal. In some of the cases the correctness of such a rule has been assumed by the court. A state statute confining the judicial review of a rate order to the evidence taken before the administrative agency, and not permitting the introduction of new evidence before the court, where such evidence could have been introduced before the commission, has been held not to violate due process, since a party whose constitutional rights have been infringed by such order is free to resort to the equity powers of a Federal court by way of injunction proceedings in which the hearing with respect to constitutional questions is de novo."

In Prendergast v. New York Telephone Co., 262 U.S. 43, at page 50, 43 S.Ct. 466, 469, 67 L.Ed. 853, which was a suit to enjoin a rate order alleged to be confiscatory, the court said: "The application for the injunction was heard by the District Court upon the pleadings and affidavits relating to the cost and value of the Company's property, its revenue and expenses. It was not necessary that the Company offer in evidence the voluminous testimony that had been taken by the Commission on the legislative question prior to making the orders in question. The bill did not challenge the orders of the Commission on the ground that it had acted arbitrarily, without any evidence. See Louisville & N. Railroad Co. v. Garrett, 231 U.S. 298, 308, 34 S.Ct. 48, 58 L.Ed. 229. The sole issue presented was whether or not the orders were confiscatory; which was to be determined by the court upon the evidence submitted to it."

Another leading case is that of Crowell v. Benson, 285 U.S. 22, at page 60, 52 S.Ct. 285, 296, 76 L.Ed. 598. There the court said: "In cases brought to enforce constitutional rights, the judicial power of the United States necessarily extends to the independent determination of all questions, both of fact and law, necessary to the performance of that supreme function. The case of confiscation is illustrative, the ultimate conclusion almost invariably depending upon the decisions of questions of fact. This court has held the owner to be entitled to 'a fair opportunity for submitting that issue to a judicial tribunal for determination upon its own independent judgment as to both law and facts.' * * * Assuming that the federal court may determine for itself the existence of these fundamental or jurisdictional facts, we come to the question, Upon what record is the determination to be made? There is no provision of the statute which seeks to confine the court in such a case to the record before the deputy commissioner or to the evidence which he has taken. The remedy which the statute makes available is not by an appeal or by a writ of certiorari for a review of his determination upon the record before him. The remedy is 'through injunction proceedings mandatory or otherwise.' * * * We think that the essential independence of the exercise of the judicial power of the United States, in the enforcement of constitutional rights requires that the federal court should determine such an issue upon its own record and the facts elicited before it."

A still more recent case Baltimore & O. R. Co. v. United States, 298 U.S. 349, at pages 368, 369, 56 S.Ct. 797, 807, 80 L.Ed. 1209, in passing upon the same point, says: "The just compensation clause may not be evaded or impaired by any form of legislation. Against the objection of the owner of private property taken for public use, the Congress may not directly or through any legislative agency finally determine the amount that is safeguarded to him by that clause. If as to the value of his property the owner accepts legislative or administrative determinations or challenges them merely upon the ground that they were not made in accordance with statutes governing a subordinate agency, no constitutional question arises. But, when he appropriately invokes the just compensation clause, he is entitled to a judicial determination of the amount. The due process clause assures a full hearing before the court or other tribunal empowered to perform the judicial function involved. That includes the right to introduce evidence and have judicial findings based upon it."

We come then to a consideration of the evidence offered in this court which discloses the following facts:

Train No. 64 leaves Columbia daily at 4:50 a. m., arriving in Sumter at 6:10 a. m. Train No. 59, operating in the reverse direction, leaves Sumter daily at 8:00 a. m., and arrives in Columbia at 9:20 a. m. The other two passenger trains operated over this line and which would remain in service are No. 58, leaving Columbia at 5:30 p. m., and arriving in Sumter at 7:00 p. m., and No. 65 leaving Sumter at 9:30 p. m., and arriving in Columbia at 10:50 p. m. At the hearing before the Commission plaintiff introduced detailed testimony showing the result of operations of the two trains which it sought to discontinue, covering the period from January 1, 1947, to July 1, 1947, there being no figures available at that time for the month of July, 1947. No question was raised as to the accuracy of these figures and they are summarized in the order of the Commission. They show that for the six months period the average daily number of passengers was less than fifteen per train; the total passenger revenue from the two trains was $3,535.31; the total mail revenue was $3,576.57; and the total express revenue was $292.38, or total gross revenue from the operation of both trains of $7,404.26. The evidence before the Commission shows that for the same period the direct operating expenses of the two trains amounted to $32,294.37, and that the total indirect operating expenses for the same period amounted to $12,720.61, making a grand total (exclusive of taxes except pay roll taxes) of $45,014.98. Based upon a train-mile basis, the average revenue from the two trains per train-mile for this period was 48.13¢; the direct cost per train-mile was $2.05, and the indirect cost per train-

mile was 87 cents, or a total cost per train-mile of $2.92. There is shown a loss of $1.57 per train-mile with respect to direct operating expenses and a loss of $2.44 per train-mile with respect to both direct and indirect operating expenses. It thus appears that for this period plaintiff's direct operating expense was approximately four and one-third times its gross revenue, and that its combined direct and indirect operating expense was slightly more than six times its gross revenue. It likewise appears from the record before the Commission that for such period the cost of locomotive fuel alone amounted to $8,066.21, or approximately $600 more than its total gross revenue, and that crew wages amounted to $9,388.47, or approximately $2,000 more than its total gross revenue.

For the period January 1, 1947, to December 1, 1947, the total direct operating expenses for the branch line was $60,746.90, and the total indirect operating expense was $24,473.39, or a grand total of $85,238.28, (not including taxes). The total gross passenger, mail and express revenue was $15,502.20, making a loss of $69,736.08 for the period. The evidence as to the earnings for this period was not offered at the hearing before the Commission because it was not then available.

The territory served by this branch line of forty-two miles is largely agricultural and is relatively sparsely settled. The only incorporated town on the branch other than Sumter and Columbia is Eastover, which has a population of approximately 473, according to the 1940 census. The only post offices between the termini are at Eastover and the two small unincorporated communities of Wedgefield and Lykes. U. S. Highway No. 76 between Columbia and Sumter mostly parallels plaintiff's branch line. In addition to plaintiff's passenger trains Nos. 58 and 65, there are ten buses daily between Columbia and Sumter, the daily schedule of same commencing at 7:00 a. m. and ending at 8:35 p. m., and nine buses daily between Sumter and Columbia leaving from 6:15 a. m. until 10:35 p. m. There are also daily buses serving the smaller communities between the termini which are not located on U. S. Highway No. 76. There were 23,543 registered automobiles in Richland County as of June 30, 1947, and 7,784 in Sumter County as of the same date.

A large part of the record before the Commission was concerned with the matter of express. The Commission finds in its order that: "All protestants appeared equally, if not more, concerned with regard to the handling of mail and express, should the trains be discontinued, as they were with regard to passenger accommodations." While the Commission finds that plaintiff's evidence as to express revenues is not too clear, it does not in its order seriously question the figures as to such revenues. These show that total gross express revenue accruing to plaintiff from the operation of the two trains for the six months period totaled only $292.38, or less than $50 per month.

One of the most vehement objections to the railroad's application in the hearing before the Commission was that if train 64, leaving Columbia at 4:50 a. m., and arriving in Sumter at 6:10 a. m., were withdrawn, there would be a twenty-four hour delay in the shipment of goods arrivng at 10:30 p. m., at Columbia on the evening train from Charlotte. The continuance of train No. 58, leaving Columbia at 6:20 a. m. would seem to answer this objection, since it is listed in the railroad's exhibit filed in this court as available for express service after the discontinuance of train No. 64. In addition to this train, there will be two trains leaving Columbia at 5:30 p. m. and 9:30 p. m., and also two trains leaving Sumter at 9:10 a. m. and 9:30 p. m., which will be available for express service. There also exists considerable bus and motor express service between these two cities. In the light of the small volume of express business on this line (for the first eleven months of 1947 the average monthly express revenue derived from train No. 59 was $34.33; on train No. 64 the average monthly express revenue was $16.46 for the same period) it is clear that reasonably adequate facilities for express service will remain after the withdrawal of the trains in question.

As to carriage of mail, plaintiff showed that in the event of discontinuance of the two trains, the Superintendent of U. S.

Railway Mail Service would recommend the installation of a star route to serve adequately the patrons of the mail service.

In order to show the earnings of the railroad system as a whole, the plaintiff offered in this court exhibits showing in detail for the year 1946, and the first eleven months of 1947 its net railway income after adjustment for excess profit tax carry back, its property investment, its non-operating income, that is, income from sources other than its own railroad operations, and the rate of return or lack of it on the value of its property. These exhibits show that after the adjustment and the elimination of non-operating income the railroad had a deficit of $2,476,704 for 1946, and a deficit of $2,973,578 for the first eleven months of 1947. Defendants offered exhibits purporting to show plaintiff's income over the ten year period 1937 to 1946, inclusive, but these calculations included non-operating as well as operating income. The railroad's income from sources other than its own railroad operations should obviously not be taken into account in considering the confiscatory effect of the Commission's actions. Board of Public Utility Commissioners v. New York Telephone Co., 271 U.S. 23, 46 S.Ct. 363, 70 L.Ed. 808; Brooks-Scanlon Co. v. Railroad Commission, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323. The railroad's income from outside investments amounted to $4,485,233 in 1946, and $6,561,302 in the first eleven months of 1947.

In reply thereto the Railroad Company showed that in the eleven year period following 1937 it sustained losses from operations in every year except the war years when conditions were abnormal. These losses or deficits ranged from a minimum of $1,518,263 in 1937, to a maximum of $4,059,786 in 1938.

In an effort to rebut the railroad's figures which showed substantial operating deficits in 1946 and the first eleven months of 1947, the Commission introduced exhibits which showed the railroad's annual expenses for maintenance of way and structure after 1937. These expenses included the cost of laying tracks, ties, rails, and other track materials, and amounted to $29,622,-

673 in 1946, and $25,830,799 in 1945, as compared to its pre-war expenditures from 1937 to 1941, inclusive, which ranged from 4 to 5 million dollars annually. The money thus spent by the railroad in 1945 and 1946 was included in its operating expenses for those years and deducted from the operating revenue to determine net operating income or loss. In 1947 these expenses totaled $26,592,605, which was similarly deducted from operating revenue in ascertaining operating income.

It is the position of the Commission that a large proportion of these expenditures in the last three years represented capital investments rather than operating expenses, and that it was improper to include them in their entirety in the operating expense account. This point was especially stressed in connection with a project of the railroad whereby it is relaying a 130 pound rail for the present 100 pound rail between Richmond, Virginia, and Jacksonville, Florida, which new rail is supposed to effect economies during the future years. Pursuant to this argument, the Commission endeavored to restate the Railroad's operating income for the years 1945 and 1946 by using the expenses incurred in 1940 (the last year before the war) as an index, and then relating the Railroad's increased expenses to those of the Southern Railway during the same period. If the results of this calculation were to be accepted, it would be necessary to increase the Railroad's operating income for 1945 by 13 million dollars approximately, and for 1946 by approximately 16 million. A similar increase would be warranted for 1947, although the Commission did not compute it. These figures are admittedly not accurate, but it is said that they represent a reasonable approximation and the best which the Commission was able to make, and that, in the absence of more accurate data forthcoming from the railroad, they should be accepted.

In opposition to this contention, the railroad produced testimony tending to show that such expenses were cyclical in nature, recurring at more or less definite intervals; that its property was severely strained during the war so that extensive post-war rehabilitation was necessary; that if it in-

creased its income in the manner suggested by the Commission, 90 per cent. of the excess would be consumed by income taxes and would thus not be available for the rehabilitation of its tracks; and that the accounting system followed by it was standard practice approved by the Interstate Commerce Commission and the federal internal revenue officials. Finally, calling attention to the cyclical nature of such expenses, it asserted the impossibility of drawing an accurate comparison between its annual expenses and those of the Southern Railway.

The accounting problem presented by these conflicting contentions is not easy to solve and we should hesitate to hold that the conclusions reached by the federal regulatory and taxing authorities are incorrect. It is, moreover, unnecessary for us to do so; for we are of the opinion that under the circumstances of this case the action of the South Carolina Commission in requiring the continuance of the two trains in question at a substantial loss cannot be sustained even though it should appear that the railroad system as a whole was run at a profit.

The Public Service Commission of South Carolina, under the statutes of the State, has the power to regulate the services and facilities of common carriers with reference to the security and accommodation of the public, but that power is not unlimited and is circumscribed by the provisions of the United States Constitution. Under the guise of such regulation the property of a carrier may not be taken by requiring it to furnish services or facilities no longer reasonably necessary to serve the public. Blease v. Charleston & W. C. Ry., 146 S.C. 496, 144 S.E. 233; Darby v. Southern Ry., 194 S.C. 421, 10 S.E.2d 465; Norfolk & W. R. Co. v. Public Service Comm. of West Virginia, 265 U.S. 70, 44 S.Ct. 439, 68 L.Ed. 904; Atchison, T. & S. F. R. Co. v. R. R. Comm., 283 U.S. 380, 51 S.Ct. 553, 75 L.Ed. 1128; Interstate Commerce Comm. v. Oregon-Wash. R. etc. Co., 288 U.S. 14, 53 S.Ct. 266, 77 L.Ed. 588; Mississippi R. Comm. v. Mobile & O. R. Co., 244 U.S. 388, 37 S.Ct. 602, 61 L.Ed. 1216; Chicago M. & St. P. R. Co. v. Wisconsin, 238 U.S. 491, 35 S.Ct. 869, 59 L.Ed. 1423, L.R.A.1916A, 1133; Northern Pac. R. Co. v. North Dakota, 236 U.S. 585, 35 S.Ct. 429, 59 L.Ed. 735, L.R.A.1917F, 1148, Ann.Cas.1916A, 1; State of Washington ex rel. Oregon R. & N. Co. v. Fairchild, 224 U.S. 510, 32 S.Ct. 535, 56 L.Ed. 863; Atlantic Coast Line R. Co. v. Wharton, 207 U.S. 328, 28 S.Ct. 121, 52 L.Ed. 230; Delaware, L. & W. Ry. Co. v. Van Santwood et al., D.C., 216 F. 252; Delaware, L. & W. Ry. Co. v. Van Santvoord, 232 F. 978; Great Northern Ry. Co. v. Nagle, D.C., 16 F.Supp. 532; Id., D.C., 28 F.Supp. 812; Northern Pac. Ry. v. Board of R. R. Com'rs, etc., D.C., 28 F.Supp. 810.

A carrier, by accepting a franchise from a state, is bound to furnish reasonably adequate facilities for the accommodation and convenience of the public and this obligation may, of course, be enforced, but as was said by the Supreme Court in Atlantic Coast Line R. Co. v. Wharton, 207 U.S. 328, 335, 28 S.Ct. 121, 123, 52 L.Ed. 230: "The term 'adequate or reasonable facilities' is not in its nature capable of exact definition. It is a relative expression, and has to be considered as calling for such facilities as might be fairly demanded, regard being had, among other things, to the size of the place, the extent of the demand for transportation, the cost of furnishing the additional accommodations asked for, and to all other facts which would have a bearing upon the question of convenience and cost."

In Southern Ry. Co. v. Public Service Commission et al., 195 S.C. 247, 262, 10 S.E.2d 769, 775, the South Carolina Supreme Court expressed the same thought in this language: "It is thus apparent that the Supreme Court of the United States recognizes that while a railroad company is required to provide adequate or reasonable facilities, this cannot be construed to mean that the same facilities shall be provided at every point regardless of public patronage or the incidental cost of such facilities."

The controlling criteria as we see it are these, the character and population of the territory served, the public patronage, or lack of it, the facilites re-

maining, the expense of operation as compared with revenue from same, and the operations of the carrier as a whole.

This brings us to defendants' main contention, or at least the one that was argued at most length, though not affirmatively set forth in the answer; that is, that by accepting the privilege of operating in the State, plaintiff is under a contractual duty to continue the facility regardless of loss. Numerous cases are cited but they are all clearly distinguishable from the case at bar. Thus in Southern Ry. Co. v. South Carolina Public Service Commission, D.C., 31 F.Supp. 707, plaintiff sought to abandon *all* passenger service on its line. The question was not as to the *adequacy* of the service but whether it should be permitted under its franchise to abandon *all* service. Here plaintiff does not ask abandonment of service but merely seeks to curtail it.

A similar question was presented in State v. Broad River Power Co., 157 S.C. 1, 153 S.E. 537, in which the court held that the utility could not abandon its street railway service entirely and retain its franchise.

In Chesapeake & O. Ry. Co. v. Public Service Commission, 242 U.S. 603, 37 S.Ct. 234, 61 L.Ed. 520, the carrier sought to avoid its charter obligation by furnishing *no* passenger service at all.

 The contention overlooks the distinction between the *absolute* duties of a carrier and its *relative* duties. This distinction is admirably summarized by the court in Southern Ry. Co. v. Public Service Commission et al., 195 S.C. 247, at page 261, 10 S.E.2d 769. It cites, among others, the case of Kurn v. State, 175 Okl. 379, 52 P.2d 841, and quotes its effect as follows: "In performance of absolute duty by railway company, question of expense is not to be considered, but, where duty sought to be enforced is one of additional convenience rather than necessity, question of expense to company and relative benefit to public is deciding factor, and may not be disregarded."

Where the duty of the carrier is absolute, the question of expense is not of controlling importance. It has been held in such a situation that a railroad company may be required to maintain and even to extend a particular service at a loss if the system as a whole is operated at a profit. Atlantic Coast Line R. Co. v. North Carolina Corporation Commission, 206 U.S. 1, 27 S.Ct. 585, 51 L.Ed. 933, 11 Ann.Cas. 398; Missouri R. R. Co. v. Kansas, 216 U.S. 262, 30 S.Ct. 330, 54 L.Ed. 472; Chesapeake & O. R. Co. v. Public Service Commission, 242 U.S. 603, 37 S.Ct. 234, 61 L.Ed. 520; United Fuel Gas Co. v. Railroad Commission, 278 U.S. 300, 49 S.Ct. 150, 73 L.Ed. 390. Indeed it has been decided that a railroad may not discontinue a particular line although both the line in question and the system as a whole are operated at a loss if the withdrawal of the line would have the effect of depriving persons or communities of reasonably adequate facilities for transportation which it is the primary duty of a railroad to provide. Fort Smith Light & Traction Co. v. Bourland, 267 U.S. 330, 45 S.Ct. 249, 69 L.Ed. 631; see also, Southern R. Co. v. Public Service Commission, supra. The basis of the rule is said to be that although a railroad may not constitutionally be compelled to operate its system as a whole at a loss, Railroad Commission of Texas v. Eastern Tex. R. Co., 264 U.S. 79, 44 S.Ct. 247, 68 L.Ed. 569, yet it may not seek to retain its franchise and at the same time avoid its contractual obligation to provide reasonably adequate service arising from the franchise by singling out specific parts or branches of its business for complete elimination.

The relief sought in the pending case relates not to one of the absolute duties of plaintiff but to a relative duty only and the cases relied upon by the defendants are not in point.

The court cannot close its eyes to conditions as they exist and which are well known to every one. As was pointed out by the South Carolina Supreme Court in Blease v. Charleston & W. C. Ry., 146 S. C. 496, 144 S.E. 233, a railroad company has but limited powers of management. It has no power to fix rates and thus has little control over its revenue. Its control over expenses, particularly wages, is also strictly limited as the spiral of recent wage

increases abundantly indicates. It is restricted in its managerial functions by rules arising from contracts with well-integrated and nation-wide labor organizations. It is in competition with bus and truck lines as well as private automobiles which travel over highways built, not by private capital, as is the case with rail carriers, but by public expenditures. It is in competition with government subsidized waterways, and, in recent years, with the expanding activities of the air lines. Recent rate increases, which in the final analysis have to come from the public pocket, are in recognition of the impact of these forces. In such circumstances it is the duty of a carrier to seek, and of regulatory agencies to permit, the elimination of those services and facilities that are no longer needed nor used by the public to any substantial extent. As was well said by the court in Southern Ry. Co. v. Public Service Commission et al., 195 S.C. 247, at page 264, 10 S.E.2d 769, "The Court must take judicial notice of the conditions existing in the last few years which have resulted in much curtailment of the business heretofore done by railroad companies. The depression is in part responsible, but aside from that, the remarkable development of motor vehicle transportation, both private and public, has had a revolutionary effect upon the railroad common carriers of the country, with a corresponding disturbance of their financial structure. They are therefore necessarily passing through a period of transition and readjustment. In the very recent case of Palmer v. Massachusetts, 308 U.S. 79, 60 S.Ct. 34, 38, 84 L.Ed. 93, cited by counsel for appellants here, in which the opinion was delivered by Mr. Justice Frankfurter, he stated: 'About a fourth of the railroad mileage of the country is now in bankruptcy.' In the light of this rather startling statement it is manifest that railroad companies are not only justified in reducing their expenses, where it is practicable to do so with reasonable regard to efficiency and without impairment of their absolute obligations, but that it is their duty to do so in the public interest."

Even where a carrier's operations as a whole are reasonably profitable it has been held in various cases that it should not be required to continue the operation of passenger trains that show such disproportionate losses as to indicate that they are not substantially used or needed by the public. In Delaware, etc., Ry. v. Van Santwood, D.C., 216 F. 252; Delaware, L. & W. Ry. Co. v. Van Santvoord, D.C., 232 F. 978, the court held that an order of the New York Public Service Commission which required the continued operation of two trains at a loss of only something over $3,000 per year was confiscatory notwithstanding the profitable operation as a whole. In Mississippi R. R. Commission v. Mobile & O. R. Co., 244 U.S. 388, 37 S.Ct. 602, 61 L.Ed. 1216, the Supreme Court set aside as confiscatory an order of the Mississippi Railroad Commission which required the continued operation of six trains where the estimated loss was $10,000 per month, though the carrier had formerly been operating as a whole at a profit. In Blease v. Charleston & W. C. Ry., 146 S.C. 496, 144 S.E. 233, it was held that the carrier could not be required to continue the operation of five passenger trains showing total losses of approximately $450 a day, notwithstanding the profitable operation of its business as a whole.

In the more recent case of Northern Pacific R. Co. v. Board of R. R. Com'rs, D.C., 46 F.Supp. 340, an order of the Commission requiring the continued operation of two passenger trains was held to be confiscatory where the carrier was sustaining an average loss of $1,000 per month on account of such operation notwithstanding that apparently the system operations as a whole were profitable. See, Brooks-Scanlon Co. v. Railroad Commission, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323; Missouri P. R. Co. v. Nebraska, 217 U.S. 196, 30 S.Ct. 461, 54 L.Ed. 727, 18 Ann.Cas. 989; Northern Pac. R. Co. v. North Dakota, 236 U.S. 585, 35 S.Ct. 429, 59 L.Ed. 735, L.R.A.1917F, 1148, Ann.Cas. 1916A, 1; Chicago, M. & St. P. R. Co. v. Public Utilities Commission, 274 U.S. 344, 351, 47 S.Ct. 604, 71 L.Ed. 1085.

When these principles are applied to the facts of the case, it becomes plain that the Commission's order should not

be sustained. No issue of fact arises as to the service rendered by the branch line or the income derived from its operation. It is clearly shown that there is no substantial need for the trains which the railroad proposes to withdraw, and hence large losses are necessarily incurred by their maintenance. It is likewise shown that the remaining trains running between Columbia and Sumter well supply all the passenger, freight and express services that the community may reasonably expect. In the light of these circumstances, it is clear that the losses attendant upon the continuance of the two trains will be confiscatory in their effect and that the injunctive relief prayed for should be granted. A judgment to this effect will be filed.