DELAWARE, L. & W. R. CO. v. VAN SANTVOORD et al.

(District Court, N. D. New York. June 6, 1916.)

RAILROADS ⬤═218—CARRIAGE OF PERSONS—FACILITIES—PUBLIC SERVICE COMMISSION—"PUBLIC NECESSITY."

Complainant operated a line of railroad between Oswego and Buffalo, N. Y. Passengers were carried by four trains daily, each way. Owing to other modes of travel and to the competition of an interurban road, travel decreased and the trains were being operated at an ever-increasing deficit. All of the principal towns on the route were served by the interurban road, and the other smaller agricultural communities were within a few miles of the road, and passengers desiring such service might board the cars after a short drive. Other railroads furnished facilities through the district. *Held* that, as the interurban cars ran at intervals of one-

---

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

half hour, the complainant railroad company could not be required to run four trains daily each way, but might withdraw two of the trains each way every day; there being no "public necessity," which means great or urgent public convenience requiring the operation of additional trains, and so an order requiring the maintenance of four trains daily each way is confiscatory.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 715; Dec. Dig. ☞218.

For other definitions, see Words and Phrases, First and Second Series, Public Necessity.]

In Equity. Bill of the Delaware, Lackawanna & Western Railroad Company against Seymour Van Santvoord and others, as Commissioners of the Public Service Commission. Decree for Complainant.

Bill in equity, filed by the Delaware, Lackawanna & Western Railroad Company to restrain the Public Service Commission, Second District, State of New York, from enforcing certain orders of said commission which direct the restoration of two trains each way each day between the cities of Syracuse and Oswego, N. Y., a distance of some 35 miles, over a leased line known as the Oswego & Syracuse Railroad.

F. W. Thomson, of Syracuse, N. Y., for complainant.
Ledyard P. Hale, of Albany, N. Y., for Public Service Commission.
S. J. Kelly, of Syracuse, N. Y., for residents of South Granby, Lamson, and Little Utica.

RAY, District Judge. This matter was before this court on motion for an injunction pendente lite, and the injunction was granted. In deciding the application this court wrote an opinion which is reported in 216 Fed. 252. No additional evidence has been submitted, and the parties stipulated in the evidence taken before the Public Service Commission, Second District, State of New York. There is no dispute in regard to the facts, unless it be the inferences that may be drawn whether or not the public convenience demands that the complainant here restore the two trains ordered restored by the Public Service Commission prior to the bringing of this action. The facts are as follows:

The complainant is a corporation organized and existing under the laws of the state of Pennsylvania. Since 1869, the complainant has operated by virtue of a lease the Oswego & Syracuse Railroad, running from the city of Oswego on the shores of Lake Ontario to the city of Syracuse. The city of Syracuse is some 35 miles from Oswego and on the main line of the New York Central & Hudson River Railroad Company. The main line of the Delaware, Lackawanna & Western Railroad Company extends from Hoboken, opposite the city of New York, through New Jersey and the eastern part of Pennsylvania, to the city of Binghamton, in the state of New York, and thence on westerly to the city of Buffalo. The complainant company also leases and operates the Syracuse & Binghamton

Railroad, extending from the city of Binghamton aforesaid to the city of Syracuse, and by means of these leased lines has a continuous line of road from Hoboken, through Scranton, Pa., and Binghamton, N. Y., and thence on through the city of Cortland to Syracuse, and on to Oswego. The complainant, the Delaware, Lackawanna & Western Railroad Company does a large interstate and considerable intrastate business. The New York Central & Hudson River Railroad runs from the city of Buffalo, through Rochester, Syracuse, Utica, Albany, and thence down the Hudson river valley to the city of New York. That road also has a line connecting with its main line running from the city of Syracuse to the city of Oswego. The New York, Ontario & Western Railroad extends from Weehawken, opposite the city of New York, through New Jersey, and across the state of New York, through the city of Oneida, to the city of Fulton, on the Oswego river, and to the city of Oswego. These branch lines of the New York Central Railroad Company and of the complainant company also run through the city of Fulton. Two of them, as seen, run direct to the city of Syracuse from Oswego, and the New York, Ontario & Western connects with the New York Central at Oneida. There is also a line of road, a trolley line, running direct from the city of Oswego to the city of Syracuse, and this is one of the lines of the Empire United Railways. This trolley line practically parallels the leased line of the complainant company, Oswego & Syracuse Railroad, from Syracuse to Oswego. This trolley line passes through the city of Fulton, which is 24 miles from Syracuse and 11 miles from Oswego and has a population of 10,480. Syracuse has a population of 137,249, and Oswego has a population of 23,368. It is seen that the cities of Oswego, Fulton, and Syracuse have abundant railroad facilities, inasmuch as the Ontario & Western Railroad Company operates two passenger trains each way daily, and the New York Central Railroad operates four passenger trains each way daily, and the complainant company now operates two passenger trains each way daily, and the said Empire Railways operate or run a trolley car every half hour between Oswego and Syracuse each way all day and a part of the night.

For many years prior to November, 1913, the Delaware, Lackawanna & Western Railroad Company operated a passenger train service between the city of Oswego and the city of Syracuse in accordance with the following schedule, viz.: Four trains per day from Syracuse to Oswego, known as Nos. 911, 915, 903, and 919, and also four trains per day between Oswego and Syracuse, known as Nos. 904, 906, 916, and 912. This train service between the cities mentioned was established prior to the construction and operation of the trolley line referred to, and which, as stated, parallels the line of the complainant substantially. In recent years there has been a large increase in travel through this section between Oswego and Syracuse by means of automobiles, and of course the trolley line has taken a large portion of the travel formerly going to the Lackawanna. In 1884 the gross revenue of the Delaware, Lackawanna & Western Railroad Company for operating its four trains each way

on the Oswego & Syracuse Railroad, between the cities of Oswego and Syracuse, amounted to $103,660.37. By reason of the building and operating of the competing lines referred to, especially the trolley line, this revenue steadily decreased, without any change in the schedule of the complainant's trains, until in 1912 it amounted to only $36,111.36, a decrease in gross revenue of $67,549.01 for 1912, as compared with 1884. In 1908 the gross revenue of the complainant company from this passenger service was $58,452.64, while after the trolley line went into operation, and in 1912, it was reduced to $36,111.36. For the year 1912 the complainant operated these four trains each way between the cities of Oswego and Syracuse at a loss of $149,563.49. For some years the complainant has been operating this passenger service in this territory between Syracuse and Oswego at a large loss. The total passenger revenue of train 919 for the first 16 days of November, 1913, was only $35.73. On November 5, 1913, it was only 20 cents, and on November 3, 70 cents, and on November 7, $1, and on November 13, the same year, 40 cents. On the 2d day of November, 1913, the Delaware, Lackawanna & Western Railroad Company withdrew from its said service the trains known as Nos. 915 and 919, running from Syracuse to Oswego, and trains Nos. 904 and 916, running from Oswego to Syracuse.

Between Syracuse and Oswego, a distance of 35 miles, the Delaware, Lackawanna & Western Railroad (leased line) runs through Baldwinsville, 12 miles from Syracuse, with a population of 3,099, Lamson, 16 miles from Syracuse, with a population of 75, South Granby, 19 miles from Syracuse, with a population of 84, the city of Fulton, 24 miles from Syracuse and 11 miles from Oswego, with a population of 10,480, and Minetto, between Fulton and Oswego, with a population of 250. Lysander, with a population of 305, is 5 miles west of Lamson, and Little Utica is 3 miles west of Lamson, and has a population of 100. Baldwinsville is abundantly supplied with railroad and trolley service, without these two trains each way per day in question, and this is true of Fulton, as we have seen, and also of Minetto. The country between Syracuse and Oswego is agricultural, and of ordinary fertility, and not at all thickly populated. This trolley line operates from the business center of Syracuse, and through the business centers of Baldwinsville, Fulton, and Minetto, to the business center of Oswego, but passes Lamson and South Granby about 3½ miles east of the center of those hamlets. The highways are in good condition. It thus appears that the train service on the complainant's road is reduced to two trains each way per day so far as Lamson, South Granby, and Little Utica are concerned, and so far as the residents there desire to use that road. By driving by team or auto some 3½ miles these people can get a trolley car every half hour. In short, the only persons to suffer any inconvenience whatever by taking off these trains are those at Lamson, South Granby, Lysander, and Little Utica; but they still have two trains each way per day and also the trolley service mentioned.

The question is simplified to this: Should this complainant be compelled to operate these two trains at a loss of thousands of dollars

per annum for the greater convenience of the very few people desiring to use them at indefinite and uncertain times residing at Lamson, South Granby, Lysander, and Little Utica? It seems to me that to compel the operation of these trains for such a purpose under such circumstances amounts to confiscation of property. It seems to me that the order of the commission is unreasonable. The records in evidence show that the total revenue from the South Granby service, when four trains per day each way were running, was on the average $3.32, and from the Lamson service $5.82 per day, or 41.5 cents and 73 cents gross revenue per day per train, respectively. This includes the revenue from express and mail matter and excess baggage. In 1912, when the eight trains were running between Syracuse and Oswego, four each way, the average gross passenger train revenue, including mail, express, and baggage revenue between the two cities, was $20.58. Considering the size and population of Lamson, South Granby, and Lysander, and the small amount of business done there, it is readily seen that it would be a gross injustice to the complainant company to compel the restoration of these nonpaying trains—trains not only nonpaying, but trains run at the great loss mentioned. It would convenience a very few people occasionally no doubt, but this is far from a public necessity. The evidence in this case justifies and requires a finding that these two trains, discontinued by the railroad company and ordered restored by the Public Service Commission, were being run at a net loss to the company of over $3,000 per annum.

If we consider the entire Delaware, Lackawanna & Western Railroad system, operating between Hoboken, N. J., and Buffalo, N. Y., including these branches from Binghamton, via Cortland and Syracuse, to Oswego, and from Binghamton, via the city of Norwich, to Utica, where it connects with the New York Central & Hudson River Railroad Company for Syracuse, and with the Ontario & Western for Oswego, and the net earnings of the complainant, it is not claimed that the entire line is operated at a loss. The net revenues are largely in excess of the operating expenses, etc. But this does not justify a compulsory operation of two more trains between Syracuse and Oswego at a large loss to the complainant, when it appears that the running of such trains is not at all necessary for the convenience of the general public, but only for the greater convenience of a small number of persons residing at local points—only two actually on the line of road, Lamson and South Granby—between two large cities only 35 miles apart, and it also appears that such local points do but little business, and are reasonably well served by the railroad corporation by two trains each way per day, and also by a half hour trolley line only 3½ miles distant from the nearest of such local points. If a railroad company, like the complainant company, may be compelled to supply such small local hamlets with four passenger trains each way, under such circumstances, at a large loss per annum, at one point such as Lamson, it may be compelled to do so at all similar points along its entire line, and its revenues would be eaten up, and in time the line would be crippled, if not bankrupted, in an effort to compel it to give extraordinary railroad conveniences to

all the people along its entire line, including those several miles distant therefrom. Thus in serving mere *local* convenience, which is not *public* convenience or necessity, the final result would be great public inconvenience.

In Oregon R. R. & N. Co. v. Fairchild et al., State Railroad Commissioners, 224 U. S. 510, 32 Sup. Ct. 535, 56 L. Ed. 863, it is held that:

"An order of a railroad commission requiring a railroad company to expend money and use its property in a specified manner is not a taking of property. To be valid there must be more than mere notice and opportunity to be heard; the order itself must be justified by public necessity and not unreasonable or arbitrary. * * * A state, acting through an administrative body, may require railroad companies to make track connections. Wisconsin, etc., R. R. Co. v. Jacobson, 179 U. S. 287 [21 Sup. Ct. 115, 45 L. Ed. 194]. But such body cannot compel a company to build branch lines, connect roads lying at a distance from each other, or make connections at every point regardless of necessity. Each case depends on the special circumstances involved."

Accordingly the court held that the orders in that case were "not justified by public necessity, and therefore deprived the railroad company of its property without due process of law."

The principle involved is the same here. The order of the Public Service Commission of the State of New York is not justified by public necessity, or even by local necessity, but, if made operative, serves local interests only, and at times affords greater local convenience to a few people. This is not sufficient to justify such an order, involving such great annual loss to the complainant railroad company. In the case just cited the court said:

"Since the decision in Wisconsin, etc., R. R. v. Jacobson, 179 U. S. 287 [21 Sup. Ct. 115, 45 L. Ed. 194], there can be no doubt of the power of a state, acting through an administrative body, to require railroad companies to make track connection. But manifestly that does not mean that a commission may compel them to build branch lines, so as to connect roads lying at a distance from each other; nor does it mean that they may be required to make connections at every point where their tracks come close together in city, town, and country, regardless of the amount of business to be done, or the number of persons who may utilize the connection, if built. The question in each case must be determined in the light of all the facts, and with a just regard to the advantage to be derived by the public and the expense to be incurred by the carrier. For while the question of expense must always be considered (Chicago, etc., R. R. v. Tompkins, 176 U. S. 167. 174 [20 Sup. Ct. 336, 44 L. Ed. 417]), the weight to be given that fact depends somewhat on the character of the facilities sought. If the order involves the use of property needed in the discharge of those duties which the carrier is bound to perform, then, upon proof of the necessity. the order will be granted, even though 'the furnishing of such necessary facilities may occasion an incidental pecuniary loss.' But even then the matter of expense is 'an important criterion to be taken into view in determining the reasonableness of the order.' Atlantic Coast Line R. R. v. North Carolina Commission, 206 U. S. 1, 26 [27 Sup. Ct. 585, 595 (51 L. Ed. 933, 11 Ann. Cas. 398)]; Missouri Pacific Ry. v. Kansas, 216 U. S. 262 [30 Sup. Ct. 330, 54 L. Ed. 472]. Where, however, the proceeding is brought to compel a carrier to furnish a facility not included within its absolute duties, the question of expense is of more controlling importance. In determining the reasonableness of such an order the court must consider all the facts—the places and persons interested, the volume of business to be affected, the saving in time and expense to the shipper, as against the cost and loss to the carrier. On a consideration of such and similar facts the question of public necessity

and the reasonableness of the order must be determined. This was done in Wisconsin R. R. v. Jacobson, in which for the first time, it was decided that a state commission might compel two competing interstate roads to connect their tracks."

The complainant company has sustained the burden of showing that the restoration of these trains is not required or demanded by public necessity, and that, considering all the relevant facts and circumstances, and the great cost of the unnecessary service, and the annual loss involved, the order was and is unreasonable, and amounts, if enforced, to a taking of complainant's property in violation of its constitutional rights. In Com. v. Gilligan, 195 Pa. 504, 510, 46 Atl. 124, the word "necessity," when used with reference to public matters, is held to mean "great or urgent public convenience." It is clear that no such necessity exists here.

It is urged by the residents of Lamson and South Granby that, taking the trains retained by the complainant company, they cannot reach Syracuse until 12 o'clock noon, and must return on the train leaving Syracuse at about 6 o'clock p. m., and that, going from these places to Oswego, they must leave home at 8:30 o'clock in the morning and cannot return until about 9:30 in the evening. But the trolley service mentioned is still open to them, and in case of necessity or urgency the few people residing at these places may drive to the trolley station and be met there on their return without great inconvenience. It would be very convenient for the farmers along a trolley line to have the cars stop at every farmhouse along the line and at every highway crossing, and save driving to the stations; but we must balance all the conveniences and all the inconveniences, as well as the revenues and the expenses, gains and losses, of the service, in determining what is a public necessity. See, also, 33 Cyc. 639, 640.

It is true, of course, that when a particular and specified duty is owed by a railroad company to the general public, and its performance is necessary for the convenience of the public, it cannot evade the performance of that duty on the plea that its discharge will entail some pecuniary loss. Atlantic Coast Line v. N. Carolina Corp. Commission, 206 U. S. 1, 27 Sup. Ct. 585, 51 L. Ed. 933, 11 Ann. Cas. 398. But when the duty is the general one to supply such train service as the public necessities demand and require, and two trains each way per day are furnished and retained, and the traveling public on that line of road generally is not affected by the reduction from four to two, as in this case, but only the people in two or three rural communities along the line, few in number, it cannot be said that the railroad company is evading or failing to perform its duty to the public by not retaining the four trains per day each way at a loss of over $3,000 per annum merely to serve such local convenience.

There may be and are cases where a considerable number of people residing in a small village or settlement travel to some larger place by rail daily, except Sundays, and perhaps Saturdays, for school or business purposes, and are required to take a particular train, or a train leaving and returning at a particular hour. The running of such trains may present a peculiar case, when their continuance would be

deemed a public necessity; but no fact or facts of this nature appear in this case. Here the convenience to the very few residents at Lamson, South Granby, Lysander, and Little Utica, who had occasion now and then to use these two discontinued trains, including those persons who at intervals used such trains in visiting those places, and who at some inconvenience are now compelled to use the remaining trains, is so out of proportion to the inconvenience and loss to the Delaware, Lackawanna & Western Railroad Company that it is impossible to find justification for judicially determining that their compulsory restoration is a public necessity.

Taking the complainant's line of railroad from Syracuse to Oswego as a whole, we find from the record that three steam railroads and one trolley line are competing for the traffic most of the way. Aside from the city of Fulton, there has been no material increase in population at any point for some 20 or more years. In 1865 Oswego had a population of 19,288, and in 1910 a population of only 23,368. It is well known that with improved state and county roads the use of automobiles has caused a considerable falling off in the use of railroads for public travel. Service by the complainant that was necessary 20 and 24 years ago, by reason of changed conditions and the facts referred to, is now unnecessary, and a burden on the complainant not justified or demanded by any sound consideration.

My conclusions are that the complainant, Delaware, Lackawanna & Western Railroad Company, has established its case and is entitled to the relief demanded. Formal findings of fact and conclusions of law may be prepared, if deemed necessary, and submitted for signature.

There will be a decree accordingly.