45 So.2d 449

**ALABAMA PUBLIC SERVICE COMMIS-
SION v. ATLANTIC COAST LINE
R. CO.**

**3 Div. 544.**

Supreme Court of Alabama.

March 23, 1950.

Rehearing Denied April 20, 1950.

A. A. Carmichael, Atty. Gen., and Mac-
Donald Gallion, Asst. Atty. Gen., for ap-
pellant.

Evans Hinson, of Montgomery, and G. E.
Reeves, of Tampa, Fla., for appellee.

**FOSTER, Justice.**

This case comes to us on appeal from the Circuit Court, in Equity, of Montgomery County. It originated in an application made on February 2, 1948 by appellee to the Alabama Public Service Commission "to discontinue the present turn-around mixed train service, daily except Sunday, between Sprague, Alabama, and Luverne, Alabama, and to substitute tri-weekly local turn-around service between Montgomery, Alabama, and Luverne, Alabama." From Sprague to Luverne is 32.3 miles. After a formal hearing and finding of facts and conclusions of law, the commission made an order December 20, 1948 denying the application. On appeal to the circuit court, in equity, that court, on July 8, 1949, reversed the order of the commission and granted the application. The commission has appealed to this Court.

The power and duty of the court on such appeal is controlled by Title 48, section 82, Code. The circuit court concluded that the commission erred in its application of the law and that its finding of facts was contrary to the substantial weight of the evidence.

There are some preliminary principles of law which need to be mentioned.

There is no statutory nor contractual duty of appellee to render such service. But the commission is charged with the duty of supervising, regulating and controlling all transportation companies doing business in this State in specified particulars, including the maintenance of such public service as may be reasonable and just. Title 48, section 104, Code.

When the statutory law of the state or provisions of a legislative charter make it the duty of a railroad operating in that state to maintain a daily railroad service, there is a different principle applicable than the one where there is no such duty. In the former instance the principle is linked to due process in two aspects, (1) the financial burden and (2) the need of the service: there is also involved its effect on interstate commerce. It is thus expressed in State v. Georgia Southern & Florida R. R. Co., 139 Fla. 115, 190 So. 527, 532, 123 A.L.R. 914: "The reasonable needs of the public are to be first considered, and all the revenue receipts, interstate and intrastate as well as mail, express and all other sources of revenue duly accruing to the line, should be considered in determining, *not whether the line is self-sustaining,* but whether the financial burden of the line grossly exceeds the needs of the public to a continuance of the service, and so reduces the revenue receipts of the company's *entire system* as to be a deprivation or taking of property of the company without due process and without just compensation, or so as to unduly burden the interstate commerce transportation service of the company. * * * it is (under that set up) clear that the duty to furnish reasonably adequate train service to local communities served by such carrier, is essentially among the imperative duties that are by law (of Florida) imposed upon railroad common carriers in consideration of the privileges conferred upon them by the State for the benefit of the public." (That is by the statutory law of Florida.)

Such imperative duty must be observed unless it "unduly affect[s] the receipts from the *entire railroad system* of the company, or impair[s] organic rights or directly and unreasonably burden[s] or impede[s] interstate or foreign commerce."

But under the authorities due process does not, under such statutes, require that each line or branch shall under every set-up yield sufficient revenue to provide a profit on that particular feature of the system. Insofar as that is concerned, the question goes to the burden on the entire system. 123 A.L.R. 930, 44 Am.Jur. 583, section 368.

When the imperative duty exists by statute such legal effect is well supported by the authorities. State v. Georgia S. & F. R. R. Co., 139 Fla. 115, 190 So. 527, 123 A.L.R. 922, et seq.; 51 Corpus Juris 972, section 883; Atlantic Coast Line R. R. v. North Carolina Corp. Comm., 206 U.S. 1, 27 S.Ct. 585, 51 L.Ed. 933, 11 Ann.Cas. 398; Atlantic Coast Line R. R. v. Public Service Comm. of South Carolina, 77 F. Supp.D.C., 675; Southern Railway Co. v. Public Service Comm., 195 S.C. 247, 10 S. E.2d 769; Kurn v. State, 175 Okl. 379, 52 P.2d 841; Ft. Smith L. & T. Co. v. Bourland, 267 U.S. 330, 45 S.Ct. 249, 69 L.Ed. 631; Railroad Comm. v. Texas & New Orleans R. R., Tex.Civ.App., 197 S.W.2d 176.

When that duty is not *imperative,* but what is called *relative,* as in Alabama, in order to justify a reduction of the service, the carrier is not required to show that the rate of return on the system requires the reduction, or that it would impede interstate commerce, but it is sufficient if the reduced plan would supply such train service as the public necessities demand and require. Delaware L. & W. R. Co. v. Van Santvoord, D.C., 232 F. 978, and cases last above cited, including Atlantic Coast Line R. R. v. Public Service Comm., D.C., 77 F.Supp. 675, 685. In the language of our statute, is "reasonable and just." Title 48, section 104, Code. "It is evident that the public service agency is under no obligation to continue to offer a service which the public will not use, where the offer is a financial burden, and where it is unreasonable to demand its continuance." Thompson v. Boston & Maine R. R., 86 N.H. 204, 166 A. 249; Atlantic Coast Line R. R. v. Public Service Comm., supra 77 F.Supp. at page 684.

Another statement of the principle is that although the operation of the entire system yields a net profit, the loss resulting from the maintenance of a certain service on a particular branch must be of sufficient importance to outweigh the inconvenience which the public will suffer as a result thereof. --123 A.L.R. 928; Thompson v. Boston & Maine R. R.,

supra; Delaware L. & W. R. Co. v. Van Santvoord, supra.

Again, it is said: "The controlling criteria as we see it are these, the character and population of the territory served, the public patronage, or lack of it, the facilities remaining, the expense of operation as compared with revenue from same, and the operations of the carrier as a whole." Atlantic Coast Line R. R. v. Public Service Comm., D.C., 77 F.Supp. 675, 684(12).

The volume of business and the revenue from it fluctuate normally in business cycles. The volume of business on this branch prior to 1946 is not shown by the finding of facts. Prospects of patronage for the future look more favorable according to the evidence and findings. The population and business in the territory served seem to have steadily increased. Plans for business expansion have been made. In this connection the commission found as follows:

"The granting of the petition was vigorously opposed by a large delegation of protestants. Since 1940 the population of Crenshaw County, in which the greater portion of the branch is located, has increased about 4,000 and at Luverne, Alabama, the termini of the branch, the increase has been about 800. With increasing population it would normally follow that business would also increase in this area.

"Protestants point out that Luverne has been assured of a furniture factory, employing two to three hundred people, to be established as soon as a suitable building can be made available. This factory plans to manufacture and ship by rail one carload of furniture each day.

"One protestant, in the lumber business, stated that tri-weekly service would result in the loss of considerable export tonnage as shipments are made on telegraphic advice for immediate unloading which means that arrival at the port cannot be made ahead of time and one day's delay would probably result in missing the vessel. This position was concurred in by another lumber shipper.

"Other protestants represented many different types of businesses including city and county officials, dealers in clothing, automobiles, hardware, farm products, cotton, peanuts, building supplies and pulpwood and also a clothing manufacturer. All testified that the inauguration of tri-weekly service would seriously disrupt business and conditions in the area affected. In fact, one protestant, a lumber manufacturer, stated that this business at LaPine needed two switches a day and that if the petition is granted it would be necessary for his mill to shut down on the days when no service was rendered."

There is no other railroad service in that area. There is a good hard surface road and bus service for passengers in all directions, with one truck freight common carrier. The passenger patronage would not demand a continuance of the railroad service. The truck service cannot of course handle the main features of the heavy freight carried by the railroad. The branch is an extensive feeder to the main line.

Counsel for petitioner observe that United States mail is not handled by the present train service, and express is available only at Petrey and Luverne, that freight constitutes the only type of rail transportation which is here important.

As a result of the facts found and recited by the Public Service Commission in detail, it thus expressed its conclusion from them:

"In determining whether public convenience and necessity permit the 50 percent curtailment of service proposed on the branch, the inconvenience occasioned by such curtailment and the consequent loss to the public must be weighed against the burden that the continued present operation of the line would impose upon the petitioner. The branch in question is of great importance to the City of Luverne, its trade area and all intermediate points on the branch, and the record shows that substantial injury thereto would result from such curtailment of service. The weight of the evidence is that the inconvenience and injury which would be occasioned by the granted (granting) of the petition offsets any burden the present operation may be upon the petitioner. This conclusion is based on our opinion that the expenses on the branch could be further minimized, that the prospect of increased tonnage and revenue are very encouraging and that tri-weekly operations would not afford adequate service.

"Upon consideration of all the evidence, we find that the present and future public convenience and necessity are not shown to permit the operation of tri-weekly service between Montgomery and Luverne in lieu of present daily, except Sunday, service between Sprague and Luverne."

The questions for us on this appeal are, whether the commission erred in applying the law to the facts found (including due process), or whether the order was based on a finding of facts contrary to legal evidence of substantial weight, Alabama Public Service Comm. v. Southern Bell T. & T. Co., Ala.Sup., 42 So.2d 655, unless we find it expedient to remand the case to the commission for further proceedings or evidence. Title 48, section 82, Code.

██ The result reached is in the nature of an inference or conclusion from the facts found and an application of the law to it as well as a determination of whether the evidential facts recited by the commission are supported by the evidence. It is clear that the evidential facts recited are, in the main, properly supported. The question therefore is whether they sustain the conclusion reached and declared by the commission that the inconvenience and injury which would be occasioned by granting the petition would offset any burden the present operation imposes upon petitioner. If so, the law was properly applied. The burden is on one who would upset the order of the commission. -Title 48, section 82, Code; Alabama Public Service Comm. v. Crow, 247 Ala. 120, 22 So.2d 721.

There was no such legal status in Atlantic Coast Line R. R. v. Public Service Comm., D.C., 77 F.Supp. 675. That was not an appeal from a commission ruling but an independent suit in the federal court based on due process. It was there said that it was not an appeal from an

administrative order, in which a factual finding based on substantial evidence would be conclusive.

The commission accepted the data furnished by petitioner as true. Presumably in the preceding years the revenue was not materially unsatisfactory, especially during the war years. For 1946 there was a net profit of $1207.37. For 1947 a net loss of $15,679.36. For the first three months of 1948 there was a net loss of $2194.54. The total operating revenue in 1946 from this branch was $129,833.87: in 1947, $135,305.10, an increase of $5,471.23: total operating expense for 1946, $128,626.50; for 1947, $150,984.46, an increase of $22,357.96.

The explanation made by petitioner of the difference between 1946 and 1947 is that crosstie replacements ($16,877.00) were largely deferred in 1946 to 1947, and because of postwar inflation. The average crosstie replacement for 1946 and 1947 (approximately $10,000.00) would alter those figures and show a net loss for 1946 also, and apparently that continues into 1948. But after making such allowance there would be a large increase of operating expense in 1947 over 1946 (approximately $17,000.00). This is said to be the result of postwar inflation. But it is hard to explain such a difference between 1946 and 1947 expense, since they were both probably subject to the same postwar inflation. No effort is shown to reduce such expense by observing economies, as in Mississippi Railroad Comm. v. Mobile & Ohio R. R. Co., 244 U.S. 388, 37 S.Ct. 602, 61 L.Ed. 1216.

■ Loss of profits from the operation due to increased cost of it, not to decrease of patronage in the service, as here shown, should be taken care of in some other way if possible than a reduction of the service. The amount of the return is not here the controlling factor.

It is suggested by appellee that an increased rate structure should not be thought to be the remedy because the commission has steadily refused petitioner's application for such increase covering all its intrastate business comparable with that authorized by the Interstate Commerce Commission on interstate traffic. No such effort seems to have been made in respect solely to this branch operation. But the remedy of petitioner to recoup its diminishing returns from service on this branch due to increasing cost of operation, if there is any remedy, is more directly in that field and in that of economy than to reduce a service whose patronage built upon it is not diminishing, and its operating revenue is substantially increasing.

If petitioner is unable to secure redress before the commission in the matter of its rate structure here applicable and to make available economies so as to provide a net profit, the remedy is not to shift its effect to a reduction of this service, so long as the entire system as a whole would not be materially affected by a continuance of the service, and the inconvenience of one would offset the burden of the other. Those who continue to patronize the service and have built their business on the basis of its continuance and made their plans accordingly, so that the volume of the traffic and operating income are not being reduced but materially increased, should not be deprived of an important part of the service, if reasonably possible to continue it. The factual status here shown is not at all comparable to that considered by the federal court in Atlantic Coast Line R. R. v. Public Service Comm., D.C., 77 F.Supp. 675.

The foregoing discussion leads us to the conclusion that we cannot say that the order of the commission shows a misapplication of the law or that its order was based upon a finding of facts contrary to legal evidence of substantial weight or the substantial weight of the evidence. We therefore cannot say that the conclusion of the commission is wrong in finding that the inconvenience and injury which would be occasioned by the granting of the petition would offset the burden which the present operation imposes on petitioner.

The judgment of the circuit court on this appeal is therefore reversed and one is here rendered, affirming the order of the commission.

Reversed and rendered.

BROWN, LAWSON and STAKELY, JJ., concur.