111 So.2d 214

**ALABAMA PUBLIC SERVICE COMMISSION**

v.

**SOUTHERN RAILWAY COMPANY.**

3 Div. 840.

Supreme Court of Alabama.

April 9, 1959.

64

John Patterson, Atty. Gen., Roy W. Kimbrough, Sp. Asst. Atty. Gen., Wm. C. Younger, Asst. Atty. Gen., and Wm. F. Black, Montgomery, of counsel, for appellant.

Jos. F. Johnston, Meade Whitaker and Cabaniss & Johnston, Birmingham, for appellee

SIMPSON, Justice.

This is an appeal from a decree of the Circuit Court, in Equity, of Montgomery County, setting aside an order of the Alabama Public Service Commission and granting appellee the right to discontinue operation of passenger trains 19 and 20.

The suit originated when the Southern Railway Company applied to the Alabama Public Service Commission on November 8, 1956, for permission to discontinue its intrastate passenger trains Nos. 19 and 20 operating between Birmingham and Mobile via Selma. Formal hearing on the petition was held in Selma, Alabama, and the Commission denied the petition and concluded its order in part as follows: "We are of the opinion that a public need exists for the service and that the need outweighs the losses being sustained by petitioner. We, therefore, find that the public convenience and necessity require the continued operation of passenger trains numbers 19 and 20 between Birmingham and Mobile, Alabama." An appeal to the Circuit Court of Montgomery County was perfected and, after hearing that court entered its decree setting aside the Commission's order and granting Southern's petition, from which decree this appeal is taken.

An ancillary proceeding out of this same suit involving the validity of an order of the Circuit Court granting a supersedeas of the Commission's order also came here by a petition for a writ of mandamus to review the Circuit Court's order granting supersedeas. That proceeding culminated in our decision that the lower court was without jurisdiction to supersede the order of the Commission and that the peremptory writ of mandamus should issue. Ex parte Alabama Public Service Commission, Ala., 106 So.2d 158.

The trains herein concerned consist of a combination baggage, mail, and express

car, and one partitioned coach, pulled by a diesel 1500 horsepower all-purpose road switcher engine. The total distance of the route traveled is approximately 264 miles. These trains have been operating between said points for more than 50 years with varying schedules from time to time. Seventy-eight stations are presently served by these trains between Birmingham and Mobile. Number 19 leaves Birmingham at 8:00 A.M. and arrives at Mobile at 5:00 P.M. Train Number 20 leaves Mobile at 7:10 A.M. and arrives at Birmingham at 3:20 P.M. These trains constitute the only passenger service operated by appellee between Birmingham and Mobile and furnish the only rail passenger service along the route, Birmingham-Selma-Mobile.

█ The power and duty of the circuit court on appeal from an order of the Public Service Commission is controlled by Title 48, Section 82, Code 1940. Alabama Public Service Commission v. Atlantic Coast Line R. Company, 253 Ala. 559, 45 So.2d 449. This statute provides that the Commission's order "shall be taken as prima facie just and reasonable" and authorizes the court to set aside the Commission's order if it finds that the Commission prejudicially erred "in its application of the law" or that the order "was based upon a finding of facts contrary to the substantial weight of the evidence."

. The issues before us for decision on this appeal, therefore, are whether the Commission erred in applying the law to the facts found or whether the order was based on a finding of facts contrary to legal evidence of substantial weight. Alabama Public Service Commission v. Atlantic Coast Line R. Co., supra; Alabama Public Service Commission v. Southern Bell Telephone & Telegraph Co., 253 Ala. 1, 42 So.2d 655; Title 48, § 82, Code 1940. And a duty rests on this Court to examine the order of the Alabama Public Service Commission and to exercise its independent judgment on both the facts and the law involved. Alabama Public Service Commission v. South-

ern Bell Telephone & Telegraph Co., supra. And we have done so.

█ Applicable principles of law in a case of this nature were clearly announced in Alabama Public Service Commission v. Atlantic Coast Line R. Co., supra [253 Ala. 559, 45 So.2d 450], which is regarded as a leading case and upon which both appellant and appellee heavily rely. We quote therefrom these preliminary rules, opinion by our late lamented associate, Mr. Justice Foster:

"There is no statutory nor contractual duty of appellee to render such service. But the commission is charged with the duty of supervising, regulating and controlling all transportation companies doing business in this State in specified particulars, including the maintenance of such public service as may be reasonable and just. Title 48, section 104, Code. * * * When that duty is not *imperative,* but what is called *relative,* as in Alabama, in order to justify a reduction of the service, the carrier is not required to show that the rate of return on the system requires the reduction, or that it would impede interstate commerce, but it is sufficient if the reduced plan would supply such train service as the public necessities demand and require. Delaware, L. & W. R. Co. v. Van Santvoord, D.C., 232 F. 978, and cases last above cited, including Atlantic Coast Line R. Co. v. Public Service Commission, D.C., 77 F.Supp. 675, 685. In the language of our statute, is 'reasonable and just'. Title 48, section 104, Code. 'It is evident that the public service agency is under no obligation to continue to offer a service which the public will not use, where the offer is a financial burden, and where it is unreasonable to demand its continuance'. Thompson v. Boston & Maine R. R., 86 .N.H. 204, 166 A. 249; Atlantic Coast Line R. R. v. Public Service Commission, supra, 77 F.Supp. at page 684.

"Another statement of the principle is that although the operation of the entire system yields a net profit, the loss resulting from the maintenance of a certain service on a particular branch must be of insufficient importance to outweigh the inconvenience which the public will suffer as a result thereof. 123 A.L.R. 928; Thompson v. Boston & Maine R. R., supra; Delaware, L. & W. R. Co. v. Van Santvoord, supra."

It will be noticed that the Atlantic Coast Line case makes a clear distinction between the imperative duty doctrine and the relative duty doctrine, the latter being the law in Alabama.

In Chesapeake & Ohio Railway Co. v. Public Service Commission of State of West Virginia, 242 U.S. 603, at pages 607 and 608, 37 S.Ct. 234, at page 236, 61 L. Ed. 520, the United States Supreme Court stated:

"One of the duties of a railroad company doing business as a common carrier is that of providing reasonably adequate facilities for serving the public. This duty arises out of the acceptance and enjoyment of the powers and privileges granted by the state and endures so long as they are retained. It represents a part of what the company undertakes to do in return for them, and its performance cannot be avoided merely because it will be attended by some pecuniary loss. Atlantic Coast Line Railroad Co. v. North Carolina Corporation Commission, 206 U.S. 1, 26, 27 S.Ct. 585, 51 L.Ed. 933; Missouri Pacific Ry. Co. v. State of Kansas, 216 U.S. 262, 279, 30 S.Ct. 330, 54 L.Ed. 472, 479; State of Washington ex rel. Oregon Railroad & Navigation Co. v. Fairchild, 224 U.S. 510, 529, 32 S.Ct. 535, 56 L.Ed. 863, 870; Chicago, Burlington & Quincy R. Co. v. Railroad Commission, 237 U.S. 220, 229, 35 S.Ct. 560, 59 L.Ed. 926, 931. That there will be such a loss is, of

course, a circumstance to be considered in passing upon the reasonableness of the order, but it is not the only one. The nature and extent of the carrier's business, its productiveness, the character of service required, the public need for it, and its effect upon the service already being rendered, are also to be considered."

And we again quote from Alabama Public Service Commission v. Atlantic Coast Line R. Co., supra:

"Again, it is said: 'The controlling criteria as we see it are these, the character and population of the territory served, the public patronage, or lack of it, the facilities remaining, the expense of operation as compared with revenue from same, and the operations of the carrier as a whole'. Atlantic Coast Line R. Co. v. Public Service Commission, D.C., 77 F.Supp. 675, 684 (12)."

With these rules in mind, we have carefully reviewed the record, which is quite voluminous (over 750 transcript pages), and by our findings the Commission's order must be tested. The correctness of that order depends upon the background of facts contained in the record.

We will now proceed to analyze those facts, developing them according to the several criteria above mentioned. No attempt will be made to elaborate further than to set out what we deem to be the most pertinent and forceful evidence presented.

### Territory Served

The 264 mile route of passenger trains 19 and 20 traverses eleven Alabama counties, namely, Jefferson, Shelby, Bibb, Chilton, Autauga, Dallas, Marengo, Wilcox, Clarke, Washington, and Mobile, and, as already stated, serves 78 stations or stops. In general, with the exception of the Jefferson and Mobile County areas, the region is primarily agricultural, but the evidence tends to show that there is a steady

increase of industrialization in this section. There is some testimony in the record obviously aimed at indicating a need for continuing passenger service in order to further such industrial progress. However, such evidence is largely indirect, inconclusive, and lacking in persuasiveness. To the contrary, it seems that the weight of the testimony, taken as a whole, deemphasizes the significance of passenger service in holding and attracting industry. The total population of the eleven counties traversed by the two trains, as shown by the 1950 Federal Census report, is 1,034,890. This represents a sizeable increase from 801,266 in 1930. The total population of communities, including or adjacent to railroad stations or stops, is 544,244, but excluding the Birmingham-Bessemer area and Mobile, the population is approximately 76,-762. The population of the 32 communities so included which have no other common carrier service except these passenger trains is shown to be 4,206. It thus appears that less than 1% of the total population of the communities served by the railroad will not have bus service readily available.

## Public Patronage

The record contains the testimony of a number of witnesses who testified that at times they had been passengers upon the two trains and that so far as they were concerned the passenger service was needed and most convenient. However, the number and cumulative effect of such witnesses so testifying was not so impressive as to merit an immediate conclusion that passenger service on this route was in fact necessary or that public patronage warranted it. The use of the railroad made by a good many of these witnesses was somewhat sporadic and the length of their trips was of the short-haul type, covering very small distances. Moreover, many of these witnesses testified that they had access to automobiles or that bus service was available nearby. The total number of passengers carried by trains 19 and 20 during the first ten months of 1956 was 17,276.

And for the entire previous year the number was 23,159. The figures for the preceding years create a striking picture. They are as follows: 1948—126,096; 1949—89,871; 1950—57,099; 1951—52,181; 1952—44,246; 1953—37,502; and 1954—28,-754. Naturally, the revenue from passenger receipts declined during these years in correspondence to the declining number of passengers. Total passenger revenue for the twelve month period, November, 1955 through October, 1956, was $32,416.42. This figure can be compared with the total wages paid to the train crews operating these two lines during the same period of $137,764.56. The train crew consisted of five men, plus a mail messenger except on Sunday, and an express messenger, except on Saturday and Sunday, a total of seven service personnel for five days each week. During the twelve month period, beginning in November, 1955 and running through October, 1956, there was an average of 6.4 passengers per train mile. The comparison of the number of passengers to crewmen displays an unusual situation. Statistics also show that the average passenger rode approximately only $\frac{1}{5}$ of the distance of the whole line. The average number of passengers per trip dropped from 172 in 1948 to 28.32 during the first ten months of 1956. And these passengers, as shown, did not ride the entire distance. Compared with 6.4 passengers per train mile on trains 19 and 20 are the corresponding figures of 37.2 for the state and 65.2 for the entire company system.

There was also quite a bit of testimony by merchants and other business men and professional persons relative to the need for continued express service. Indeed, some necessity was shown by many of those who so testified. The effect of the evidence was to show that inconvenience will be caused to many who now use the express service. Express on this line is now handled in a railway express car with an express manager as a part of the regular train complement. There are a number of express agencies between Selma and Mobile, but

only three intermediate points between Selma and Birmingham now have express service, viz., Maplesville, Plantersville, and Wilton. Appellee proposes to handle through express between Birmingham and Selma in sealed freight cars, or alternately through Mobile in a regular express car with messenger when necessary. Express for or from Plantersville will be handled according to appellee's proposed plan, in a box car hauled by a local freight and set out for loading. The Wilton-Montevallo area will be served similarly by a freight car on a freight train out of Anniston, Alabama. Maplesville express will be handled by a motor express truck operated by the Gulf, Mobile and Ohio Railroad. On the other hand, between Selma and Mobile, a regular express car with an express messenger will be hauled by local freights which have substantially the same schedules as trains 19 and 20. Appellee points out that the Commission in its order determined that the only change in the type of express handled will be the elimination of live express at Wilton and Plantersville.

Review of the record shows that many of the witnesses testifying on the subject of express service were unfamiliar with the proposed new express service. Several of these witnesses did not testify directly as to the insufficiency of the proposed service, and the evidence aimed towards establishing the unsatisfactory character of the proposed service, although evincing hardship in isolated cases, is not probatively convincing. It must be expected that the removal of the express service as presently operated will work hardship and inconvenience in certain individual instances. The record here, and its overall picture in this respect, reflects no general public need for the express service exactly as it is carried on today and suggests that actual need and convenience require the present setup in individual situations only.

### Facilities Remaining

Freight service along these lines will remain unchanged. Express service will be altered only in the respects heretofore described. However, if appellee discontinues its passenger trains, all of the intermediate parts between Birmingham and Mobile will be left without passenger train service.

Evidence relative to transportation by air in the record is negligible, and the air traffic factor in this case is minuscule.

Of the seventy-eight stations presently served by these trains between Birmingham and Mobile, forty-six are located on or immediately adjacent to good highways, with competing common carrier bus service. Approximately 540,000 people live in the 46 communities adequately served by the competing bus service. As already pointed out, only about 4,000 persons who live in the remaining 32 communities will not have bus service readily available.

The highways in this area served by these trains are good. Appellee has adduced testimony showing that the ratio of persons per registered passenger automobile in the eleven counties through which these trains run is 3.6, as compared to the state average of 4. On the other hand, the ratio of total registered motor vehicles to persons in the eleven counties is 3, which is the same as the state of Alabama. For the period 1941 through 1955, the state showed the fourth highest percentage increase in passenger car registrations of the nation, although during the same period, the state had only a 6.7 percent increase in population. Many of the protestants who testified revealed that they came to the Commission hearing by automobile or other type of conveyance, and not by train. Such testimony was interspersed by references to the witnesses' use of means of transportation other than the appellee's passenger trains within the area.

### Comparison of Operation Expense with Revenue

Total revenues for the twelve month period November, 1955 through October, 1956 were $105,956.46, broken down as follows: Passenger, $32,416.42; Mail, $60,-

302.41; Express, $13,165.92; and Miscellaneous, $71.71. There was no disagreement between the parties to this dispute as to the revenue figures.

Great difficulty, however, was experienced in agreeing upon amounts allocable to expense in the operation of passenger trains 19 and 20.

Appellee's petition filed with the Commission showed direct expenses for the operation of said trains from March 1, 1955 through February 29, 1956, at $308,899.44. In its original computation, at the hearing, appellee showed these expenses at $321,-660.70. However, realizing that due to the terrain, the train fuel expense included seemed high, appellee conducted an actual test on the route, the results of which caused appellee to adjust the train fuel cost by taking only about one-half of the original figure included, thereby reducing the total direct expenses assigned to passenger trains 19 and 20 to the amount of $298,005.-30. Since appellee proposed at the hearing to render express service along the route of trains 19 and 20 by operating express cars on freight trains, it then submitted another computation showing direct expenses, giving effect to the continuance of express connection with the operation of express service, and this resulted in another slight reduction in the cost figure. According to the latter computation, which results in the smallest figure arrived at by the appellee, direct expenses were in excess of revenues in the amount of $186,564.59.

On the other hand, the Commission found, as shown in the order, from its calculation of revenues received and direct expenses rendered that the excess of total expenses over revenue would be in the amount of $138,631.83. The Commission went further and asserted that the net income which would have resulted to appellee as a result of their discontinuance would only be $66,543.28, after deduction of federal taxes (petitioner was shown to be in the 52% corporate income tax bracket) on the immediate savings thus realized.

The gist of the disagreement between the Commission and the company as to the method of computation of direct expenses lies in the Commission's refusal to accept the formula recommended by a committee of the National Association of Railroad and Utilities Commissioners (often referred to as NARUC), of which the Commission is a member. The Commission did not feel bound to follow the NARUC formula in classifying expense items between those accepted as "wholly unavoidable" and those not definitely so established, viz., those determined on an average unit cost basis. We can see no point in discussing the NARUC formula in extenso or render a decision either accepting or rejecting it. It would serve no useful purpose here to act as arbiter between the Commission and the circuit court, which did expressly accept the formula. We would observe, however, as did the court in Illinois Central R. Co. v. Illinois Commerce Commission, 410 Ill. 77, 101 N.E.2d 588, 591, that the "cost, therefore, should properly include a just proportion of the expenses incurred for all facilities of which that in question forms a part", and that in "determining the true cost, all the outlays which pertain to the service in question should be considered".

It suffices to say that the figure derived from either of the computations is quite unreasonable, unjust, and burdensome on the appellee and such loss should not be allowed to continue, unless the particular line is required for public need and convenience.

### Operations of Carrier as a Whole

Appellant earnestly insists that the earnings of Southern Railway on its entire intrastate business in Alabama and from its system as a whole must be taken into consideration, and that if gain is shown and the earnings have not been impaired by losses incurred in the particular branch line or operation, then the discontinuance must be disallowed. And evidence in the record does in fact show that appellee has profited quite well on its state and interstate systems

on the whole. But we do not feel that the applicable law accentuates this one factor into such a prominent position in relationship to the other factors and criteria to be considered in such cases.

Appellant has relied upon the authority of remarks made by Justice Frankfurter in his concurring opinion, which was joined in by Justice Jackson, to the opinion of Chief Justice Vinson in the case of Alabama Public Service Commission v. Southern Railway Co., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002. It would seem that the remarks in the concurring opinion were obiter dicta, as the court did not reach the merits of the case in coming to its decision.

In Atlantic Coast Line R. Co. v. Public Service Commission of South Carolina, supra [77 F.Supp. 686], it was held that an order of the South Carolina Public Service Commission requiring the continued operation of two intrastate passenger trains at a substantial loss could not be sustained even if the railroad system as a whole was being run at a profit. The court there observed that the power of the Public Service Commission of South Carolina to regulate the services and facilities of common carriers with reference to the security and accommodation of the public is not unlimited but is circumscribed by the federal constitution and the property of a carrier may not under the guise of such regulation be taken by requiring it to furnish services or facilities no longer reasonably necessary to serve the public. The court went on farther to say that in adverse circumstances it is the duty of a carrier to seek, and of regulatory agencies to permit, the elimination of those services and facilities that are no longer needed nor used by the public to any substantial extent. "Even where a carrier's operations as a whole are reasonably profitable it has been held in various cases that it should not be required to continue the operation of passenger trains that show such disproportionate losses as to indicate that they are not substantially used or needed by the public."

We think the quoted portion above from the Alabama Public Service Commission v. Atlantic Coast Line R. Co. case expresses quite clearly the Alabama law on this point and impels against the contention of the Commission.

There is no merit in appellant's argument that the failure of appellee's original petition to allege facts concerning the overall profits of the carrier and its subsequent omission to introduce full and complete evidence on this subject were fatal to their case.

It is apt to mention in this opinion that the record reveals that this was the second proceeding before the Commission on these same trains. Upon a showing of substantial loss in the prior case, the Commission likewise denied the company's petition to discontinue the trains. No appeal was taken from that order; rather, appellee elected to comply with certain requirements and suggestions set out by the Commission and to make some effort to regain public use of the service. The record in the instant case recites certain efforts of the company to improve the public use. The results were unavailing, as the facts heretofore set out plainly demonstrate.

The court below held that the Commission erred in its application of the law to the facts and that such findings of fact as were made by the Commission were contrary to the substantial weight of the evidence. Notwithstanding, the presumption in favor of the Commission's order and the burden resting on the appellee to overturn that presumption, we find ourselves in agreement with the court below. We conclude that whatever inconvenience and injury to the public will result from the discontinuance of these trains will not offset the very heavy burden which the present operation imposes on the appellee. Alabama adheres to the relative doctrine, and negligible use of the trains at a few small communities can hardly warrant a

finding that public necessity for the trains exists or that their removal would entail substantial public inconvenience. The true interests of the general public, therefore, are best served by the elimination of uneconomic services if that can be done without unduly impairing transportation facilities in the territory served. Illinois Central R. Co. v. Illinois Commerce Commission, supra. The problems raised by the discontinuance of trains numbers 19 and 20 depend largely upon the predominantly local factor of public need for the service rendered. Alabama Public Service Commission v. Southern Railway Co., supra [341 U.S. 341, 71 S.Ct. 766].

In that last cited case this court stated: "State and federal regulatory agencies have expressed concern over the chronic deficit arising out of passenger train operations as a threat to the financial security of the American railroads and have recommended drastic action to minimize the deficit, including the discontinuance of unpatronized and unprofitable service". Railroads no longer have a monopoly in the transportation field. Illinois Central R. Co. v. Illinois Commerce Commission, supra. "The court can not close its eyes to conditions as they exist and which are well known to everyone." Atlantic Coast Line R. Co. v. Public Service Commission of South Carolina, supra. The law must not allow itself to become bound to purely local, sentimental feelings attached to a once useful institution now, to some extent, fading. Alignment with modern trends of economic policy in the field of railroad transportation militates against the prolonged survival of such local, short hauls for passenger purposes when its usefulness therefor has been shown to be not in the public interest, as in the case in hand.

Affirmed.

LIVINGSTON, C. J., and GOODWYN and COLEMAN, JJ., concur.